MB

FILED

AUG 1 2 2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

EC

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)
v )  No. 19 CR 123
Adán Cenén Casarrubias-Salgado, ) Hon. Mathew Kennelley, Judge
defendent )

## MOTTION FOR COMPASSIONATE RELEASE

Now Comes Adán Cenén Casarrubias-Salgado, (Adan), for his motion
for compassionate Realease pursuant to 18 USC § 3142(i)
states as follows:

1.) Adan has been held as a prisoner in a Mexican Jail
since 2015, As part of the plagued and sharply critized
AYOTZINAPA Rural Teachers College (student disappearance)
Investigation.

2.) In June 2019 the Mexican Prosecutor General office created
the special unid for the investigation and litigation of the
Ayotzinapa case, After a video was released showing military
and a police officers torturing a detainee, Carlos Canto Salgado
As of October, the unit brought charges against former
officials for failing to conduct an adequate investigation
and USING TORTURE to coerce confessions. But
had not

①

charged anyone for the disappearance of the students
( SEE Exhibits A and B, Country Reports on Human
Rights Practices )

3) The United Nations Convention against Torture prohibits
Torture and other cruel, inhuman or degrading treatment
or punishment, as well as acquisition of confessions obtained
through illicit means. Both the United States and Mexico
are signatory to the United Nations Convention Against
Torture. Additionally, our U.S Constitution safeguards us
from such evil immoral practices.

4.) Ultimately the Unites States does not sanction torture
of any kind in any country, and that is the Unites States.
that I'm proud to serve as a United States District Court
Judge. Unites States v. Beltran-Leon 9 4th 485 ( 7th cir 2019 )
quoting District Judge Reuben Castillo.

5) During the time Adan was in the custody of the Mexican
military, SEMAR teams ( mexican marines ) he was repeatedly
subjected to; suffocation with plastic bags, beatings with
Robber coarted metallic police batons, shocking with electrodes
and waterboarding. Complications from this Torture included
psychological issues, Adan has been broken like a man
on the rack, as it were.

6.) Adan was brought to the MCC-CHicago in May 2022
since that time he has constantly requested ( in Spanish )

medical treatment for his tortured injuries. He has been met with deliberate indifference by the over worked understaffed MCC-Clinic. Chronic pain is his constant companion. However, he has been deprived acces to consult with a physician.

7.) Adan is grateful to have been Removed from the dark well in Sonora Mexico. Where he was consigned to a slow agonizing death. He only seeks to recover enough so that he may collaborate in his defense.

8.) It is appropriate under 18 U.S.C 3142 (i) to authorize bond where it is used sparingly to permit a defendant to be released. Only where one is suffering from terminal illness or serious [Torture] injury. While being incarcerated at MCC-Chicago with its limited resources Adan's extreme deprivations are not likely to improve. A defendant was afforded relief where, [like Adan] correctional authorities could no longer manage his health. Unites States v. Scarpa, 815 F Supp 88 (EDNY 1993). Likewise, release was deemed appropiate where medical conditions required for recovery were not provided. Unites State v. Cordero, 185 F Supp 2d 143 (D.P.R 2002). A defendant's release is warranted where he is suffering from a terminal illness or serious illness. United States v. Lee, 2020 U.S Dist Lexis 62047 (qusting United States v. Hamilton 2020 US Dist Lexis 49095.)

9.) Adan has family Roots here in chicago. Also he has friendships dating back to his Mama Lunas Pizzeria delivery days. His son and daughter reside in chicago His children attend Columbia College and the University of Illinois respectively. They would prove an invaluable assent during Adan's recovery. Nor is Adan likely to pose a flight risk in light of the Torture he received in Mexico.

wherefore Adan respectfully requests that this court enter an order:
A.) Allowing Release on bond conditions
B.) Allowing him to heal from torture
c.) All relief that this court deems just and proper.

Respectfully Submitted

Adan Cenén Casarrubias-Salgado
# 11711-424
Metropolitan Correctional Center
71 West Van Buren Street
CHicago, Illinois 60605

## MEXICO 2019 HUMAN RIGHTS REPORT

### EXECUTIVE SUMMARY

**Mexico** is a multiparty federal republic with an elected president and bicameral legislature. Andres Manuel Lopez Obrador of the National Regeneration Movement won the presidential election in July 2018 in generally free and fair multiparty elections and took office in December 2018. Citizens also elected members of the Senate and the Chamber of Deputies, governors, state legislators, and mayors.

The National Guard and federal, state, and municipal police are responsible for enforcing the law and maintaining order. The National Guard, created in March, is a civilian institution reporting to the Secretariat of Public Security and Civil Protection. The Federal Police are scheduled to be subsumed into the National Guard by 2020, but in the interim remain under the Public Security Secretariat and National Security Commission. The bulk of National Guard personnel consist of seconded army and navy elements that have an option to return to their services after five years. State preventive police report to state governors, while municipal police report to mayors. The Secretariat of National Defense and Secretariat of the Navy also play a role in domestic security, particularly in combating organized criminal groups. The constitution grants the president the authority to use the armed forces for the protection of internal and national security, and the courts upheld the legality of the armed forces' role in undertaking these activities in support of civilian authorities. The National Migration Institute, under the authority of the Interior Secretariat, is responsible for enforcing migration laws and protecting migrants. Although authorities generally maintained effective control over the security forces, there were instances in which elements of security forces acted independently of civilian control.

Significant human rights issues included reports of the involvement by police, military, and other government officials and illegal armed groups in unlawful or arbitrary killings, forced disappearance, and torture; harsh and life-threatening prison conditions in some prisons; impunity for violence against human rights defenders and journalists; violence targeting persons with disabilities and lesbian, gay, bisexual, transgender, and intersex persons.

Impunity for human rights abuses remained a problem, with extremely low rates of prosecution for all crimes. The government's federal statistics agency (INEGI) estimated 94 percent of crimes were either unreported or not investigated.

### Section 1. Respect for the Integrity of the Person, Including Freedom from:

#### a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

Country Reports                 1

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



EXHIBIT A

There were several reports government entities or their agents committed arbitrary or unlawful killings, often with impunity. Organized criminal groups were implicated in numerous killings, acting with impunity and at times in league with corrupt federal, state, local, and security officials. From 2006 to 2018, the Attorney General's Office reported 88 criminal investigations for homicide committed by a public official, resulting in the conviction of 25 persons.

In August, Genaro Vargas Ruelas was found dead while in police custody in Oxkutzcab, Yucatan State. Municipal police stated he committed suicide, but family members rejected this account, claiming Genaro's body had multiple signs of torture, including broken ribs and bruises on his back and genitalia, which did not coincide with the official autopsy report's conclusion of suicide.

As of September authorities had not investigated or made any arrests in the January 2018 killing of three persons and arbitrary arrest of 38 persons in La Concepcion, Guerrero State. On June 7, 25 persons (members of the Ejidos and Communities Council Opposed to La Parota Dam) were released after 18 months in jail when a judge ruled there was no evidence against them. The 13 other persons had already been released.

In November 2018 a court acquitted a soldier who was charged in the 2017 killing of two men in Palmarito, Puebla State.

In August the Attorney General's Office issued an arrest order for six federal police agents accused of murder, four of whom also were accused of attempted murder, in the 2015 killing of 16 unarmed civilians in Apatzingan, Guerrero State. On August 27, a district judge ruled there was sufficient evidence to keep the officers in pretrial detention until the conclusion of the trial.

After a series of appeals, in August 2018 the federal judicial branch upheld the substance of a federal court order originally handed down in 2017 and confirmed in May 2018. The order directed the Attorney General's Office to reopen the investigation into the 2014 killings of 22 civilians by members of the military in Tlatlaya, **Mexico** State. The order specifically called for an investigation into the role of the chain of command and the military order to "take down criminals." The judge ruled the federal investigation thus far had not been exhaustive, adequate, or effective.

Environmental activists continued to be targets of violence, a majority of them from indigenous

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

communities. On February 20, gunmen shot and killed Samir Flores Soberanes, an indigenous and environmental rights activist (see section 6, Indigenous People).

Criminal organizations carried out widespread killings and other illegal activities throughout the country. On November 4, nine U.S. citizens (three women and six children) were killed by gunmen while traveling by car near the city of Bavispe, Sonora State. As of December 31, authorities had arrested seven suspects for alleged involvement in the killings, including the public security director from Janos, Chihuahua State, who oversaw the local police force.

## b. Disappearance

There were reports of forced disappearances by organized crime groups, sometimes with allegations of state collusion. In its data collection, the government often merged statistics on forcibly disappeared persons with missing persons not suspected of being victims of forced disappearance, making it difficult to compile accurate statistics on the extent of the problem. The National Commission of Human Rights (CNDH) registered 12 cases of alleged "forced or involuntary" disappearances through August 6.

Investigations, prosecutions, and convictions for the crime of forced disappearance were rare. According to information provided by the Attorney General's Office, from October 1, 2013, to August 27, 2018, courts issued eight convictions and 17 acquittals for forced disappearance, and 18 sentences were in the appeals process. At the federal level, as of August the Specialized Prosecutor's Office for Forced Disappearances was investigating 980 cases of disappeared persons, while other federal offices were investigating 1,000 additional cases, according to the human rights organization SERAPAZ. Some states made progress investigating this crime. In Veracruz State, from January to July 30, prosecutors opened 573 investigations into disappearances, although family members alleged prosecutors undercounted the actual number of disappeared persons cases.

There were credible reports of police involvement in kidnappings for ransom, and federal officials or members of the national defense forces were sometimes accused of perpetrating this crime. In July, five Cuban migrants in Ciudad Juarez, Chihuahua State, filed a complaint with the National Human Rights Office that alleged federal police officers kidnapped them and extorted thousands of dollars from them.

Nationwide, the National Search Commission (CNB) reported the exhumation of the remains of at least 337 persons in 200 clandestine graves between December 1, 2018, and May 13. In August the CNB released a report stating 3,024 clandestine graves were located between 2006 and September 2019, with 4,974 bodies exhumed. The same report noted 200 bodies had been identified, with 116 of those

Country Reports                                   3

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

returned to families. The CNB also reported that between February 13 and May 28, it received 481 reports of missing persons and located 15 alive and five deceased. On December 5, the government formally created an Extraordinary Mechanism for Forensic Identification to bring together national and international forensics experts to help identify 37,000 unidentified remains held in government facilities.

The federal government and several states failed to meet deadlines for implementing various provisions of the 2017 General Law on Forced Disappearances, and efforts by the federal government were insufficient to address the problem. State-level search commissions should have been established by mid-April 2018; as of September 2019, 25 of 32 states had done so. By September a total of 26 states had met the requirement to create specialized prosecutors' offices focused on forced disappearances. Only four states (Coahuila, Nuevo Leon, Veracruz, and Zacatecas) had established citizen councils as required by the law. The federal government created a National System for the Search of Missing Persons as required by the law but as of August had not established the required National Forensic Data Bank.

As of April 30, 2018, a total of 37,435 individuals were recorded as missing or disappeared, according to the National Registry of Missing Persons, up 40 percent compared with the total number at the end of 2014. The CNB shut down this registry in July 2018 as part of the process to create a new registry, which it planned to release publicly in early 2019, but it was still not operational as of September. The new database was to include more than 24,000 profiles of the relatives of the disappeared as well as information such as fingerprints, parents' names, and dates of birth of the missing persons, according to government officials.

According to media reports, the Veracruz state officials arrested in 2018 on suspicion of involvement in forced disappearances in previous years were released in August due to lack of evidence. The persons released included former state police chief Roberto Gonzalez Meza, former state attorney general Luis Angel Bravo Contreras, and more than 50 other former high-ranking Veracruz state security officials and members of the state police. Media outlets speculated the charges were politically motivated by then governor Miguel Angel Yunes, who was under investigation by the state attorney general for ordering the murder of former mayor Maricela Vallejo Orea on April 24.

As of September no charges had been filed regarding the 2018 disappearance of 23 persons in Nuevo Laredo, Tamaulipas, and none of the missing individuals had been located.

Investigations continued into the disappearance of 43 students from a teacher-training college in Ayotzinapa in Iguala, Guerrero, in 2014. Victims' relatives and civil society continued to be highly critical of the handling by the Attorney General's Office of the original investigation, noting there had been no

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

convictions related to the disappearances of the 43 students. The court ruled that the investigation had not been prompt, effective, independent, or impartial and ordered the government to create a special investigative commission composed of representatives of the victims, Attorney General's Office, and the CNDH. The government appealed the ruling, claiming it infringed upon the principle of separation of powers. An intermediate court upheld the appeal, and the case was before the Supreme Court for review.

On December 3, 2018, two days after his inauguration, President Andres Manuel Lopez Obrador ordered the creation of a truth commission–headed by the Interior Secretariat's undersecretary for human rights–to re-examine the disappearances of the 43 students. The Presidential Commission for Truth and Justice in the Ayotzinapa Case was formally inaugurated in January. The commission included senior officials from the Secretariat of the Interior, Secretariat of Foreign Affairs, Secretariat of Finance, and victims and the civil society organizations that legally represent them. In March the Inter-American Commission on Human Rights (IACHR) reached an agreement with the presidential commission to form a special follow-up mechanism for the case to continue monitoring progress. On April 8, the Foreign Affairs Secretariat also signed an agreement with the UN Office of the High Commissioner for Human Rights (OHCHR) to provide technical assistance to the commission.

In other developments related to the Ayotzinapa case, in June an anonymous video was released allegedly showing military and police officers torturing a detainee, Carlos Canto Salgado. The video contradicted findings from two separate investigations by the CNDH and the Attorney General's Office that determined no evidence of torture existed in Canto's case. As of September none of the individuals in the video–including Carlos Gomez Arrieta, then head of the Federal Investigative Police; Ezequiel Pena Cerda, a federal police officer; or Ariel Castillo Reyes, from the Secretariat of the Navy (SEMAR)–had been charged.

In June the Attorney General's Office created the Special Unit for the Investigation and Litigation of the Ayotzinapa Case, in compliance with a May 2018 federal court ruling that called for the government to rectify irregularities in the Attorney General's Office's original investigation of the case. Omar Gomez Trejo, an experienced lawyer and human rights expert, was appointed as head of the new unit.

On August 30, a judge dismissed charges against Gildardo Lopez Astudillo for his alleged role in the Ayotzinapa case after finding the evidence collected against him was obtained through torture and arbitrary detention. He was one of the main suspects in the case, according to prosecutors at the time, and the government claimed he confessed to his involvement after his initial detention. As of September none of the alleged perpetrators of the disappearances had been convicted, and the majority of those initially accused had been released from detention on the grounds their confessions were obtained through torture.

Country Reports           **5**

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

Federal law prohibits torture and other cruel, inhuman, or degrading treatment or punishment, as well as the admission of confessions obtained through illicit means as evidence in court. Despite these prohibitions, there were reports of security forces torturing suspects.

As of June the CNDH registered 20 complaints of torture. The majority of these complaints were from the states of Tamaulipas, **Mexico**, and Veracruz, and also **Mexico** City; federal police and Attorney General's Office officials were accused as the responsible parties in most torture cases. As of March only 15 of 32 states had specialized prosecutor's offices for torture as called for by law.

As of January the Attorney General's Office was investigating 4,296 torture-related inquiries under the previous inquisitorial legal system (initiated prior to the 2016 transition to an accusatorial system) and 645 investigations under the accusatorial system. Federal courts handed down 45 convictions between 2013 and 2018.

On July 31, authorities arrested six police officers from the Coahuila prosecutor general's office and detained one on homicide charges, after they participated in an operation resulting in the death of a Honduran migrant. Initial police reports indicated the migrant shot at officers conducting a counternarcotics raid, but Coahuila prosecutor general Gerardo Marquez stated on August 8 that no shots were fired by the migrant.

In September 2018 the CNDH called upon federal authorities to investigate the alleged illegal detention and torture of 17 persons between 2013 and 2017 by SEMAR marines. The CNDH stated 17 federal investigators ignored or delayed acting on reports made by the victims. The CNDH detailed sexual assaults, beatings, electric shocks, and suffocation committed by marines against their captives before turning them over to federal law enforcement. The detentions and torture allegedly occurred in the states of Coahuila, Nuevo Leon, Sinaloa, Veracruz, and Zacatecas.

In January the CNDH issued a report on torture and other forms of mistreatment committed against 19 persons in the state of Aguascalientes between 2011 and 2013 by the state prosecutor's office. Investigative police, prosecutors, public attorneys, and forensic personnel from the state prosecutor's

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



office allegedly colluded in committing and hiding torture during that period. The then state prosecutor (who also served as deputy prosecutor at the Attorney General's Office) was alleged to have been directly involved. After the report was published, the former prosecutor filed an injunction, and the CNDH was forced to remove the report from its website pending resolution of the case.

As of October no charges had been filed in the 29 cases of sexual torture between 2006 and 2015 in 12 states. Twenty-seven women reported their torture to a judge, but no investigation was ordered in 18 of the cases. Members of the Secretariat of National Defense, SEMAR, federal police, and state police of Tamaulipas, Veracruz, and Coahuila were allegedly involved.

On April 26, the UN Committee against Torture released the findings of the seventh periodic report of **Mexico** on measures taken to implement the provisions of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. The report highlighted that one of the main challenges for the government was developing indicators and producing comprehensive, reliable statistics on the number of investigations, prosecutions, and convictions related to cases of torture and mistreatment.

## PRISON AND DETENTION CENTER CONDITIONS

Conditions in prisons and detention centers were often harsh and life threatening.

<u>Physical Conditions</u>: According to the Federal Prison System, as of March there were 198,475 inmates in 305 state, federal, and municipal facilities with a designed capacity of 215,083.

After visiting more than half of the country's prisons in 2018, the CNDH reported that 45 percent of the state prisons visited had operational command problems, with inmates controlling or running various aspects of the prison. According to the report, state prisons were understaffed, and pretrial detainees were held with convicted criminals. The prisons also suffered from poor sanitary conditions and a general lack of opportunities for social reintegration. The report singled out Baja California Sur, Nayarit, and Tamaulipas as the states with the worst prison conditions. Regarding federal prisons, the CNDH noted significant understaffing at all levels, which affected access to programs, activities, and medical services and promoted segregation of inmates.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

In its 2017 National Diagnostic of Penitentiary Supervision, the CNDH reported several incidents of sexual abuse of inmates in the state of **Mexico**'s Netzahualcoyotl Bordo de Xochiaca Detention Center. Cases of sexual exploitation of inmates were also reported in **Mexico** City and the states of Chihuahua, Guerrero, Nayarit, Oaxaca, Puebla, Quintana Roo, Sinaloa, Sonora, Tamaulipas, and Veracruz. The report highlighted overcrowding, self-governance, and a lack of personnel, protection, hygienic conditions, and actions to prevent violent incidents. The report faulted prisons for failing to separate prisoners who had yet to be sentenced from convicts.

Organized criminal groups reportedly continued to oversee illicit activities from within penitentiary walls. In November, following a joint federal-state-municipal inspection of Ciudad Juarez's CERESO III prison in search of weapons, drugs, cell phones, and other contraband, incarcerated members of a criminal organization at the prison reportedly ordered gang members in Ciudad Juarez to attack state authorities and installations, as well as commercial vehicles around the city.

According to civil society groups, migrants at some detention centers faced abuse when comingled with MS-13 gang members. In addition they reported some migration officials discouraged persons from applying for asylum, claiming their applications were unlikely to be approved, and that some officials from the National Institute of Migration kidnapped asylum seekers for ransom.

Administration: Authorities did not always conduct investigations into credible allegations of mistreatment.

Independent Monitoring: The government permitted independent monitoring of prison conditions by the International Committee of the Red Cross, CNDH, and state human rights commissions.

Improvements: Federal and state facilities continued to seek or maintain international accreditation from the American Correctional Association. As of August the total number of state and federal accredited facilities was 98, an increase of six from the previous year. Guanajuato was the only state to have all its prisons accredited.

A CNDH report showed a decrease in the number of prison homicides, fights, and riots, compared with its 2018 report. The drop was credited to an increase in the training providing to prison staff.

Country Reports                                **8**

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

### d. Arbitrary Arrest or Detention

Federal law prohibits arbitrary arrest and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court, but the government sometimes failed to observe these requirements. Between January 2017 and August 2018, the CNDH recorded 618 complaints of arbitrary detention.

### ARREST PROCEDURES AND TREATMENT OF DETAINEES

The constitution allows any person to arrest another if the crime is committed in his or her presence. A warrant for arrest is not required if an official has direct evidence regarding a person's involvement in a crime, such as having witnessed the commission of a crime. In a 2018 report, **Mexico** Evalua, a domestic think tank, determined 90 percent of all arrests fell under this category. This arrest authority, however, is applicable only in cases involving serious crimes in which there is risk of flight. Bail is available for most crimes, except for those involving organized crime and a limited number of other offenses. In most cases the law requires that detainees appear before a judge for a custody hearing within 48 hours of arrest, during which authorities must produce sufficient evidence to justify continued detention. This requirement was not followed in all cases, particularly in remote areas of the country. In cases involving organized crime, the law allows authorities to hold suspects up to 96 hours before they must seek judicial review.

The procedure known in Spanish as *arraigo* (a constitutionally permitted form of pretrial detention employed during the investigative phase of a criminal case before probable cause is fully established) allows, with a judge's approval, for certain suspects to be detained prior to filing formal charges. Following the introduction of the accusatorial justice system, however, there was a significant reduction in the number of persons detained in this manner, falling from more than 1,900 in 2011 to 21 in 2018. The UN Committee against Torture noted its "concern at reports documenting allegations of acts of torture and mistreatment of persons deprived of their liberty by virtue of orders of arraigo, some of which are carried out in military installations."

Some detainees complained of a lack of access to family members and to counsel after police held persons incommunicado for several days and made arrests arbitrarily without a warrant. Police occasionally failed to provide impoverished detainees access to counsel during arrests and investigations as provided for by law, although the right to public defense during trial was generally respected. Authorities held some detainees under house arrest.

Country Reports **9**

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Human rights nongovernmental organizations (NGOs) and victims alleged numerous incidents between January and August in which Coahuila state police forces abused detainees in custody in the border city of Piedras Negras and surrounding areas. As of August the state prosecutor general's office was investigating the accusations.

Arbitrary Arrest: Allegations of arbitrary detentions persisted throughout the year. The IACHR, the UN Working Group on Arbitrary Detention, and NGOs expressed concerns about arbitrary detention and the potential for arbitrary detention to lead to other human rights abuses.

On August 7, according to media reports, a man was arbitrarily arrested, severely beaten, and threatened by Security and Civilian Protection officers in **Mexico** City. The victim was reportedly outside his house walking his dog when police arrested him without a warrant. Two days passed before the victim was advised of drug trafficking charges against him. Four days later he was released after family members successfully gathered evidence showing he was the wrong person.

Pretrial Detention: Lengthy pretrial detention was a problem. The accusatorial justice system allows for a variety of pretrial measures, including electronic monitoring, travel restrictions, and house arrest, that reduced the use of the prison system overall, including the use of pretrial detention. The law provides time limits and conditions on pretrial detention, but federal authorities sometimes failed to comply with them, since caseloads far exceeded the capacity of the federal judicial system. Violations of time limits on pretrial detention were endemic in state judicial systems. The OHCHR documented cases in the states of **Mexico** and Chiapas where detainees had remained for more than 12 years in pretrial detention. A constitutional reform passed in February increased the number of crimes for which pretrial detention is mandatory and bail is not available, including armed robbery, electoral crimes, fuel theft, and weapons possession.

Detainee's Ability to Challenge Lawfulness of Detention before a Court: Persons who are arrested or detained, whether on criminal or other grounds, may challenge their detention through a writ of habeas corpus. The defense may argue, among other things, that the accused did not receive proper due process, suffered a human rights abuse, or had his or her constitutional rights violated. By law individuals should be promptly released and compensated if their detention is found to be unlawful, but authorities did not always promptly release those unlawfully detained. In addition, under the criminal justice system, defendants apprehended during the commission of a crime may challenge the lawfulness of their detention during their court hearing.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

### e. Denial of Fair Public Trial

Although the constitution and law provide for an independent judiciary, court decisions were susceptible to improper influence by both private and public entities, particularly at the state and local level, as well as by transnational criminal organizations. Authorities sometimes failed to respect court orders, and arrest warrants were sometimes ignored. Across the criminal justice system, many actors lacked the necessary training and resources to carry out their duties fairly and consistently in line with the principle of equal justice.

### TRIAL PROCEDURES

In 2016 all civilian and military courts officially transitioned from an inquisitorial legal system based primarily upon judicial review of written documents to an accusatorial trial system reliant upon oral testimony presented in open court. In most states alternative justice centers employed mechanisms such as mediation, negotiation, and restorative justice to resolve minor offenses outside the court system.

Under the accusatorial system, judges conduct all hearings and trials and follow the principles of public access and cross-examination. Defendants have the right to a presumption of innocence and to a fair and public trial without undue delay. Defendants have the right to attend the hearings and to challenge the evidence or testimony presented. Defendants may not be compelled to testify or confess guilt. The law also provides for the rights of appeal and of bail in most categories of crimes. Defendants have the right to an attorney of their choice at all stages of criminal proceedings. By law attorneys are required to meet professional qualifications to represent a defendant. Not all public defenders were qualified, however, and often the state public defender system was understaffed. Administration of public defender services was the responsibility of either the judicial or the executive branch, depending on the jurisdiction. According to the Center for Economic Research and Teaching, most criminal suspects did not receive representation until after their first custody hearing, thus making individuals vulnerable to coercion to sign false statements prior to appearing before a judge.

Defendants have the right to free assistance of an interpreter, if needed, although interpretation and translation services into indigenous languages were not always available. Indigenous defendants who did not speak Spanish sometimes were unaware of the status of their cases and were convicted without fully understanding the documents they were instructed to sign.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

The lack of federal rules of evidence caused confusion and led to disparate judicial rulings.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## MEXICO 2020 HUMAN RIGHTS REPORT

### EXECUTIVE SUMMARY

**Mexico** is a multiparty federal republic with an elected president and bicameral legislature. Andres Manuel Lopez Obrador of the National Regeneration Movement party coalition won the presidential election in July 2018 in generally free and fair multiparty elections and took office in December 2018. Citizens also elected members of the Senate and the Chamber of Deputies, governors, state legislators, and mayors.

The National Guard, state, and municipal police are responsible for enforcing the law and maintaining order. The National Guard, which began operations in June 2019, is a civilian institution reporting to the Secretariat of Public Security and Civil Protection. On December 31, 2019, the Federal Police was disbanded, and on May 4, all remaining assets and personnel were transferred to the National Guard. The bulk of National Guard personnel are seconded from the army and navy and have the option to return to their services after five years. State preventive police report to state governors, while municipal police report to mayors. The Secretariat of National Defense and Secretariat of the Navy also play a role in domestic security, particularly in combating organized criminal groups. The constitution was amended in 2019 to grant the president the authority to use the armed forces to protect internal and national security, and courts have upheld the legality of the armed forces' role in law enforcement activities in support of civilian authorities through 2024. The National Migration Institute, under the authority of the Interior Secretariat, is responsible for enforcing migration law and protecting migrants. Although authorities generally maintained effective control over the security forces, there were instances in which security force elements acted independently of civilian control. Members of security forces committed some abuses.

Significant human rights issues included: reports of the involvement by police, military, and other government officials and illegal armed groups in unlawful or arbitrary killings and forced disappearance; torture by security forces; harsh and life-threatening prison conditions in some prisons; arbitrary arrest and lengthy pretrial detention; violence against journalists and human rights defenders; serious acts of corruption; impunity for violence against women; violence targeting persons with disabilities and lesbian, gay, bisexual, transgender, and intersex persons; and the existence of the worst forms of child labor.

Impunity and extremely low rates of prosecution remained a problem for all crimes, including human rights abuses. The government's federal statistics agency estimated 94 percent of crimes were either unreported or not investigated. There were reports of some government agents who were complicit with international organized criminal gangs, and there were low prosecution and conviction rates in these abuses.

Country Reports                                    1

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.


"EXHIBIT B"

Organized criminal elements, including local and transnational gangs, and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, bribery, intimidation, and other threats, resulting in high levels of violence, particularly targeting vulnerable groups. The government investigated and prosecuted some of these crimes, but the vast majority remained in impunity.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

## A. ARBITRARY DEPRIVATION OF LIFE AND OTHER UNLAWFUL OR POLITICALLY MOTIVATED KILLINGS

There were several reports government entities or their agents committed arbitrary or unlawful killings, often with impunity. The National Human Rights Commission (CNDH) is responsible for independently investigating security force abuses, including killings, and can issue formal recommendations for prosecution. State human rights commissions investigate state police forces and can issue similar recommendations. State and federal prosecutors are independent of the executive branch and have the final authority to investigate and prosecute security force abuses. Organized criminal groups were implicated in numerous killings, acting with impunity and at times in collusion with corrupt federal, state, local, and security officials.

On May 4, Giovanni Lopez died in police custody after police allegedly beat him for three hours. Municipal police officers from Ixtlahuacan de los Membrillos, Jalisco, arrested Lopez for resisting arrest and transported him to their precinct after witnesses said he intervened when police attempted to arrest his neighbor. On June 5, the governor announced three municipal police officers had been arrested for Lopez' death.

On July 3, the newspaper and website *El Universal* presented a video of soldiers in Nuevo Laredo, Tamaulipas, which showed them approaching a truck after a gun battle with suspected cartel members. One of the soldiers discovered a combatant still alive and subsequently received orders to kill the wounded person. A total of 12 persons died in the encounter: nine suspected cartel members who allegedly initiated the gun battle with the army patrol and three bound and gagged kidnapped victims the cartel members were transporting in their trucks when the firefight broke out. The Prosecutor General's Office and the Secretariat of National Defense launched separate investigations into the incident.

As of September the six federal police agents accused of murder and attempted murder of 16 unarmed civilians in Apatzingan, Michoacan, in 2015 remained in pretrial detention, pending conclusion of the

Country Reports                                    2

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

trial.

Environmental activists, the majority from indigenous communities, continued to be targets of violence. In January, Homero Gomez, an indigenous and environmental rights defender, went missing and was later found dead (see section 6, Indigenous People). As of October 15, no suspects had been arrested.

Criminal organizations carried out widespread killings and other illegal activities throughout the country. On April 3, a clash between La Linea cartel and the Sinaloa cartel left 19 persons dead in Madera, Chihuahua.

## B. DISAPPEARANCE

There were reports of numerous forced disappearances by organized crime groups, sometimes with allegations of state collusion. In its data collection, the government often merged statistics on forcibly disappeared persons with missing persons not suspected of being victims of forced disappearance, making it difficult to compile accurate statistics on the extent of the problem.

Investigations, prosecutions, and convictions for the crime of forced disappearance were rare. According to the Attorney General's Office, from October 2013 to August 2018, courts issued eight convictions and 17 acquittals for forced disappearance, and another 18 sentences were in the appeals process.

At the federal level, the Specialized Prosecutor's Office for Forced Disappearances was investigating 980 cases of disappeared persons, while other federal offices were investigating 1,000 additional cases as of August, according to the human rights organization SERAPAZ. Some states made progress investigating this crime. From January to July 2019, prosecutors in Veracruz State opened 573 investigations into disappearances, but family members alleged the prosecutors undercounted the actual number of cases.

In February a federal judge in Monterrey sentenced five marines to 22 years in prison and ruled the secretary of the navy should publicly apologize for the 2013 forced disappearance of Armando Humberto del Bosque Villarreal in Colombia, Nuevo Leon. Hunters found the body of del Bosque in a forest outside the naval base two months after he disappeared. The sentences were the first against the armed forces in Nuevo Leon. On December 2, a judge reversed the sentence for failures in the formulation of the

Country Reports                                    3

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

accusation, finding that the marines should have been tried according to the General Law on Forced Disappearances of Persons approved in 2017 and not the federal penal code, which was repealed with the passing of the previous rule.

The federal government and states continued to implement the 2017 General Law on Forced Disappearances. By December all 32 states had met the requirement to create state search commissions, according to the National Search Commission (CNB). Through a nationwide assessment process, the CNB revised the government's official number of missing or disappeared persons repeatedly during the year as additional data became available. As of December the CNB reported there were 79,658 missing or disappeared persons in the country. Some cases dated back to the 1960s, but the vast majority occurred since 2006. The year 2019 had the second-highest number of cases on record, with 8,345 reported missing or disappeared, up from 7,267 cases reported in 2018. Nongovernmental organizations (NGOs) commended the government for providing a more accurate accounting and urged the government to strengthen efforts to investigate and prosecute cases.

Nationwide, the CNB reported the exhumation of the remains of at least 2,361 persons in 1,413 clandestine graves between December 1, 2018, and November 30, 2020. In July the CNB reported that between January 2006 and June 2020, officials located 3,978 clandestine graves and exhumed 6,625 bodies. The same report noted that between December 1, 2018, and November 2020, of the 894 bodies identified, 506 were returned to families.

In July the CNB launched a public version of the National Registry of Disappeared and Missing Persons. Between January and June, it received 5,905 reports of missing persons and located 3,078 alive and 215 deceased. In December 2019 the government created the Extraordinary Mechanism for Forensic Identification to bring together national and international forensic experts to help identify 37,000 unidentified remains held in government facilities, but as of September it was not fully operational.

During the year the government raised the CNB's budget to $32.8 million, a 55 percent increase over the 2019 budget. Nonetheless, according to NGOs, the state search committees often lacked the human and financial resources to fulfill their mandate. For example, those in Campeche, Sonora, Tabasco, and Tlaxcala had fewer than five employees on staff, according to an NGO assessment of human rights in the country. Civil society and families of the disappeared stated the government's actions to prevent and respond to disappearances were largely inadequate and lacked sufficient resources to address the scale of the problem.

On June 26, the bodies of 14 persons were found in Fresnillo, Zacatecas. The state prosecutor general's office transferred the remains to the Zacatecan Institute of Forensic Sciences, but as of October no

Country Reports                                        4

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

arrests had been made.

Jalisco disappearances data remained under scrutiny as more mass graves were discovered. The NGO Mexican Center for Justice for Peace and Development criticized Jalisco's recordkeeping practices for complaints related to disappeared persons, accusing the Jalisco Prosecutor General's Office of lacking a methodology for data collection and not being transparent in information sharing. The NGO tallied 2,100 unsolved disappearances from July 2019 to August 2020 (and 9,286 persons unaccounted for overall since the 1960s). The Jalisco Prosecutor General's Office and the Jalisco Forensics Institute were unable to process increasing numbers of cases, with dozens of sets of human remains discovered during the year.

In November authorities announced the discovery of 113 bodies in a mass grave in El Salto, Jalisco. As of December relatives were able to identify 30 of the bodies. Another mass grave was being excavated in Ixtlahuacan de los Membrillos, Jalisco, where 25 bodies were found.

The federal government created a National System for the Search of Missing Persons as required by law but as of August had not established the required National Forensic Data Bank. The Prosecutor General's Office owned a previous genetics database, which consisted of 63,000 profiles, and was responsible for the new database. The previous platform lacked interconnectivity between states and failed to connect family members effectively to the remains of their missing relatives.

Investigations continued into the disappearances of 43 students from the Ayotzinapa Rural Teachers' College in Iguala, Guerrero, in 2014. Victims' relatives and civil society continued to criticize handling by the Attorney General's Office of the original investigation, noting there had been no convictions related to the disappearances of the 43 students. On July 7, the Prosecutor General's Office announced forensic scientists at the University of Innsbruck conclusively identified the remains of one of the 43 disappeared students, Christian Alfonso Rodriguez Telumbre. This was the first identification made in the case in more than five years.

In June 2019 the Prosecutor General's Office created the Special Unit for the Investigation and Litigation of the Ayotzinapa case. As of October the unit brought charges against former officials for failing to conduct an adequate investigation and using torture to coerce confessions but had not charged anyone for the disappearances of the students.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

In March a federal judge issued an arrest warrant for Tomas Zeron, who led the investigation of the case by the former criminal investigations unit in the Attorney General's Office at the time of the students' disappearances. Zeron was wanted on charges related to his conduct of the investigation, including torturing alleged perpetrators to force confessions, conducting forced disappearances, altering the crime scene, manipulating evidence, and failing to perform his duties. He was believed to be in Israel, and the government requested that the Israeli government issue an arrest warrant and extradite him.

Also in March a federal judge issued arrest warrants against four government officials and a marine for torturing detainee Carlos Canto Salgado and obstruction of justice in the investigation of the Ayotzinapa case. In June the Prosecutor General's Office arrested Jose Angel Casarrubias, also known as "El Mochomo," a leader of the Guerreros Unidos cartel that allegedly collaborated with security forces to disappear the students. A judge later ordered his release due to lack of evidence, but the Prosecutor General's Office detained him again shortly thereafter on separate organized-crime-related charges. As of September the Prosecutor General's Office detained the head of the Federal Investigative Police, Carlos Gomez Arrieta, who handed himself in, and another high-level official, Blanca Alicia "N" from the Public Ministry, who allegedly tampered with evidence. On November 12, authorities arrested Captain Jose Martinez Crespo, the first arrest of a soldier in the case and one of the officers in charge of the army battalion in Iguala the night of the disappearances. Prosecutors charged him with forced disappearance and colluding with the Guerrero Unidos cartel. By December the Federal Prosecutor's Office had requested 101 arrest warrants related to the case, of which 63 were issued and 47 carried out, leading to 78 arrests.

In August 2019 a judge dismissed charges against Gildardo Lopez Astudillo for his alleged role in the Ayotzinapa case after finding the evidence collected against him was obtained through torture and arbitrary detention. The Prosecutor General's Office appealed the dismissal, and as of October the decision was pending.

As of November no alleged perpetrators of the disappearances had been convicted, and 78 of those initially accused were released due to lack of evidence, generally due to irregularities in their detention, including confessions obtained through torture.

## C. TORTURE AND OTHER CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT

Federal law prohibits torture and other cruel, inhuman, or degrading treatment or punishment, as well as the admission of confessions obtained through illicit means as evidence in court. Despite these prohibitions, there were reports of security forces torturing suspects.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

In November 2019 the NGO Mexican Commission for the Defense and Promotion of Human Rights released a 12-year study on torture, which registered 27,342 investigations from 2006 to 2018. There were 10,787 federal investigations and 16,555 state-level investigations, of which 50 resulted in sentences, 15 of which were later exonerated.

Between January and August 20, the CNDH registered 25 complaints of torture and 132 for arbitrary detention. The majority of these complaints were against authorities in the Prosecutor General's Office, Federal Police, Interior Ministry, and the navy. As of April, 20 of 32 states had specialized prosecutor's offices for torture as called for by law.

On July 27, Adolfo Gomez was found dead in his jail cell in Chiapas. Authorities declared Gomez hanged himself, but his family said his body showed signs of torture. Gomez was arrested with his wife Josefa in an operation that authorities stated uncovered a trafficking ring of 23 children, but later evidence showed the children were all members of the same extended family and were with their relatives. In August the Chiapas State Prosecutor General's Office confirmed Gomez committed suicide and announced the arrest of the director and two penitentiary center employees accused of flagrant omission in their duty of care. The accused were released shortly after.

Impunity for torture was prevalent among the security forces. NGOs stated authorities failed to investigate torture allegations adequately. As of January 2019 the Prosecutor General's Office was investigating 4,296 torture-related inquiries under the previous inquisitorial legal system (initiated prior to the 2016 transition to an accusatorial system) and 645 investigations under the accusatorial system. A 2019 report by the Prosecutor General's Office stated it brought charges in one torture case during that year. The Office of the UN High Commissioner for Human Rights (OHCHR) signed an agreement with the government in April 2019 to provide human rights training to the National Guard, but as of October the OHCHR reported no training had been carried out.

**PRISON AND DETENTION CENTER CONDITIONS**

Conditions in prisons and detention centers were often harsh and life threatening.

Physical Conditions: According to the Federal Prison System, as of June there were 210,287 inmates in 295 state and federal facilities with a designed capacity of 221,574. Some prisons were undersubscribed while others were overcrowded. According to online media *El Economista*, 46 percent of prisoners shared

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

a cell with five or more other inmates and 13 percent shared a cell with 15 or more inmates. The state of Baja California had the highest number of overcrowded cells.

The CNDH's 2019 *National Diagnostic of Penitentiary Supervision* reported that state prisons were understaffed and suffered from poor sanitary conditions as well as a lack of opportunities for inmates to develop the skills necessary for social reintegration. The report singled out Guerrero, Tamaulipas, and Veracruz as the states with the worst prison conditions. The CNDH noted significant understaffing at all levels in federal prisons, which affected access to programs, activities, and medical services and promoted segregation of inmates.

Organized criminal groups reportedly continued to oversee illicit activities from within penitentiary walls. The National Prison Administration reported that during an enforcement operation from May to July, it detected nearly 15,000 cell phones in use in 21 prisons around the country and cancelled 16,500 cell phone numbers. On February 20, authorities transferred 27 inmates from Nuevo Laredo's state prison to Altamiro Federal Prison, according to the Ministry of Public Security in Tamaulipas. This followed an earlier transfer of seven prisoners from Nuevo Laredo to federal prison on January 29. Experts believed the transfers were likely an attempt to break cartel control of Nuevo Laredo's prisons.

According to civil society groups, migrants at some detention centers faced abuse when commingled with gang members and other criminals.

As of August 17, a total of 2,686 prisoners had contracted COVID-19, 263 had died of the disease, and 3,755 were released to prevent further contagion, according to the NGO Legal Assistance for Human Rights. In response to a civil society organization lawsuit, a **Mexico** City court ruled authorities must implement COVID-19 detection and preventive health protocols for detainees and their families in prisons in **Mexico** City and psychiatric wards nationwide. As of September only three states had complied with all or nearly all the court-mandated health measures, according to the NGO Documenta.

The CNDH, in its report on COVID-19 measures in holding facilities, found most detention facilities could not comply with social distancing measures or several other health recommendations due to lack of space, personnel, or equipment.

NGOs alleged the National Migration Institute (INM) failed to take effective steps to stop the spread of COVID-19 among migrants. After initial criticism the INM released or repatriated migrants in its detention

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



facilities to mitigate the spread of infection.

Administration: Authorities did not always conduct investigations into credible allegations of mistreatment. In September the NGOs Citizens in Support of Human Rights and Human Rights Watch sent a letter to the governor of Nuevo Leon urging investigations into reports of abusive conditions in the state's prisons as well as the deaths of three inmates during the year. The NGOs noted only one of the three deaths was being investigated. As of October the governor had not responded to the letter.

Independent Monitoring: The government permitted independent monitoring of prison conditions by the International Committee of the Red Cross, CNDH, and state human rights commissions.

In January more than 20 NGOs and international organizations stated the INM denied them entry to migratory stations to access migrants who arrived in a caravan on January 18-21, preventing independent oversight and denying information to the NGOs. The INM resumed granting access after public criticism.

Improvements: Federal and state facilities continued to seek or maintain international accreditation from the American Correctional Association. As of August, six state facilities received accreditation, raising the total number of state and federal accredited facilities to 98. The six states demonstrated compliance with numerous standards, including written policies and procedures ensuring continual staff training and increased accountability of staff and inmates.

## D. ARBITRARY ARREST OR DETENTION

Federal law prohibits arbitrary arrest and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court, but the government sometimes failed to observe these requirements. Between January and August, the CNDH recorded 132 complaints of arbitrary detention.

## ARREST PROCEDURES AND TREATMENT OF DETAINEES

The constitution allows any person to arrest another if the crime is committed in his or her presence. A

Country Reports                                        9

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

warrant for arrest is not required if an official has direct evidence regarding a person's involvement in a crime, such as having witnessed the commission of a crime. In a 2018 report, **Mexico** Evalua, a domestic think tank, determined 90 percent of all arrests fell under this category. This arrest authority, however, is applicable only in cases involving serious crimes in which there is risk of flight. Bail is available for most crimes, except for those involving organized crime and a limited number of other offenses. In most cases the law requires detainees to appear before a judge for a custody hearing within 48 hours of arrest, during which authorities must produce sufficient evidence to justify continued detention. This requirement was not followed in all cases, particularly in remote areas of the country. In cases involving organized crime, the law allows authorities to hold suspects up to 96 hours before they must seek judicial review.

The procedure known in Spanish as *arraigo* (a constitutionally permitted form of pretrial detention employed during the investigative phase of a criminal case before probable cause is fully established) allows, with a judge's approval, for certain suspects to be detained prior to filing formal charges. Following the introduction of the accusatorial justice system, however, there was a significant reduction in the number of persons detained in this manner, falling from more than 1,900 in 2011 to 21 in 2018.

Some detainees complained of a lack of access to family members and to counsel after police held persons incommunicado for several days and made arrests arbitrarily without a warrant. Police occasionally failed to provide impoverished detainees access to counsel during arrests and investigations as provided for by law, although the right to public defense during trial was generally respected. Authorities held some detainees under house arrest.

Arbitrary Arrest: Allegations of arbitrary detentions persisted throughout the year. The Inter-American Commission on Human Rights (IACHR), the UN Working Group on Arbitrary Detention, and NGOs expressed concerns regarding arbitrary detention and the potential for it to lead to other human rights abuses.

The Jalisco State Commission for Human Rights reported at least 118 complaints against police for arbitrary detention, forced disappearance, and abuse of power after statewide protests on June 4-9 following the death of Giovanni Lopez, who died in municipal police custody in Ixtlahuacan de los Membrillos.

Pretrial Detention: Lengthy pretrial detention was a problem, and authorities did not always release promptly those detained unlawfully. The accusatorial justice system allows for a variety of pretrial measures, including electronic monitoring, travel restrictions, and house arrest, that reduced the use of the prison system overall, including the use of pretrial detention. The law provides time limits and

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

conditions on pretrial detention, but federal authorities sometimes failed to comply with them, since caseloads far exceeded the capacity of the federal judicial system. Violations of time limits on pretrial detention were endemic in state judicial systems. The OHCHR documented cases in the states of **Mexico** and Chiapas in which detainees remained for more than 12 years in pretrial detention. A constitutional reform passed in February 2019 increased the number of crimes for which pretrial detention is mandatory and bail is not available, including armed robbery, electoral crimes, fuel theft, and weapons possession.

Reports indicated women suffered disproportionately from pretrial detention. As of June, 54 percent of women in federal prison and 46 percent in municipal and state prisons were in pretrial detention, while 39 percent of men in the federal and local judicial system were in pretrial detention, according to a report from the Secretariat of Security and Civilian Protection. In October authorities announced they would comply with the recommendation of the OHCHR's Working Group on Arbitrary Detention and release Brenda Quevedo Cruz, who had spent 11 years in prison without trial. Quevedo Cruz remained in detention at year's end.

## E. DENIAL OF FAIR PUBLIC TRIAL

Although the constitution and law provide for an independent judiciary, court decisions were susceptible to improper influence by both private and public entities, particularly at the state and local level, as well as by transnational criminal organizations. Authorities sometimes failed to respect court orders, and arrest warrants were sometimes ignored. Across the criminal justice system, many actors lacked the necessary training and resources to carry out their duties fairly and consistently in line with the principle of equal justice.

## TRIAL PROCEDURES

In 2016 all civilian and military courts officially transitioned from an inquisitorial legal system based primarily upon judicial review of written documents to an accusatorial trial system reliant upon oral testimony presented in open court. In most states alternative justice centers employed mechanisms such as mediation, negotiation, and restorative justice to resolve minor offenses outside the court system.

Under the accusatorial system, judges conduct all hearings and trials and follow the principles of public access and cross-examination. Defendants have the right to a presumption of innocence and to a fair and public trial without undue delay. Defendants have the right to attend the hearings and to challenge the evidence or testimony presented. Defendants may not be compelled to testify or confess guilt. The law also provides for the rights of appeal and of bail in most categories of crimes. Defendants have the

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

right to an attorney of their choice at all stages of criminal proceedings. By law attorneys are required to meet professional qualifications to represent a defendant. Not all public defenders were qualified, however, and often the state public defender system was understaffed. The administration of public defender services was the responsibility of either the judicial or the executive branch, depending on the jurisdiction. According to the Center for Economic Research and Teaching, most criminal suspects did not receive representation until after their first custody hearing, thus making individuals vulnerable to coercion to sign false statements prior to appearing before a judge.

Defendants have the right to free assistance of an interpreter, if needed, although interpretation and translation services into indigenous languages were not always available. Indigenous defendants who did not speak Spanish sometimes were unaware of the status of their cases and were convicted without fully understanding the documents they were instructed to sign.

The lack of federal rules of evidence caused confusion and led to disparate judicial rulings.

On July 29, legislators approved a law making all judicial sentences public. The increased transparency could discourage discriminatory and arbitrary sentences, according to various NGOs.

**POLITICAL PRISONERS AND DETAINEES**

There were no reports of political prisoners or detainees.

**CIVIL JUDICIAL PROCEDURES AND REMEDIES**

Citizens have access to an independent judiciary in civil matters to seek civil remedies for human rights violations. For a plaintiff to secure damages against a defendant, authorities first must find the defendant guilty in a criminal case, a significant barrier due to the relatively low number of criminal convictions.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Adán Cenen Casasrrubias-Salgado
#11711-424
Metropolitan Correctional Center
71 West Van Buren Street
Chicago, Illinois 60605

Legal Meail
Legal Mail

RECEIVED
2022 AUG 12 AM 8:38

08/12/2022-25

Legal Mail
Legal Mail

CLERK OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
219 SOOTH DEARBORN STREET
CHICAGO, ILLINOIS
60604



INCARCERATION
REN  IC  STIC
I. W. V N. BUREAU  FCI
This letter has neither been opened nor inspected.

AUG 06 2022
AUG 09 2022

If the sender has a question or problem ov   which the facility has jurisdiction,
or if the sender raises a question of policy     restrict of this facility's jurisdiction,
or enclosing attached copies, the material     furthermore enclosure or reply,
please return to the enclosure and  s the upon the sender address,
please return to the enclos   e to the above address.

RECEIVED

2022 AUG 12 AM 8:48