UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ADAN CASARRUBIAS SALGADO

No. 19 CR 321

Judge Matthew F. Kennelly

### GOVERNMENT'S *SANTIAGO* PROFFER AND MOTION TO ADMIT EVIDENCE PURSUANT TO FED. R. EVID. 801(D)(2)(E)

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully submits the following proffer of evidence as to the admission at trial of certain coconspirator statements against defendant ADAN CASARRUBIAS SALGADO, and moves for the admission of such statements pursuant to Fed. R. Evid. 104(a) and 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.    INTRODUCTION

On April 11, 2019, a grand jury returned an eleven-count indictment against defendant, charging narcotics conspiracy (21 U.S.C. 846), distribution and possession with intent to distribute of narcotics (21 U.S.C. 841(a)(1)), and money laundering (18 U.S.C. 1956(a)(2)(B)(i)).

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the charged conspiracy, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established

practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would establish the existence of the conspiracy or all of the coconspirator statements that were made in furtherance of the charged conspiracy. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the conspiracy described in Count One of the indictment and the participation of the coconspirators, including defendant. As a result, this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses. Finally, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

## II.    OVERVIEW OF THE NARCOTICS CONSPIRACY

As alleged in Count One of the indictment, defendant conspired with Individual A and with others to knowingly and intentionally possess with intent to distribute and distribute 1 kilogram or more of heroin beginning no later than in or about April 2014, and continuing until at least in or about June 2014. The charged conspiracy corresponds to the drug-trafficking and money-laundering operations of the Guerreros Unidos drug cartel. Between at least 2012 and November 2014 (including during the period charged in the indictment), defendant and other member of the Guerreros Unidos transported kilograms of heroin from Mexico to Chicago by concealing the drugs inside passenger buses. Upon arriving in Chicago, Individual A

and other Chicago-based members of the conspiracy would extract the drugs from the buses inside warehouses located in Aurora and Batavia. They would then distribute the heroin as directed by Mario Casarrubias Salgado (defendant's brother), and later by defendant himself (after Mario's arrest). Individual A and the other local members of the conspiracy would also collect drug proceeds and hide them in the buses to ship them back to Mexico—likewise as directed by defendant and his brother.

## III. GOVERNING LAW

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

### A. Existence of and Membership in the Conspiracy

In accord with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), this Court must determine whether statements by the defendants' coconspirators will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this

---

[1] No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

determination, this Court must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy ...." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendants and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid.801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of

co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *United States v. Bourjaily*, 483 U.S. 171, 178, 180 (1987); *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604

---

[2] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant, without establishing the Bourjaily factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant out of cocaine not hearsay because showed membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) (addressing "war stories" about the drug trade); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Longstreet,* 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at

different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

### B. Statements Made "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea*, 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the

conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630 *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);[3]

- to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), abrogated on other grounds by *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar*, 573 F.3d at 545;

---

[3] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341*,* 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992);

- statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85

F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 F. App'x 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

### C. Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own statements, for example, are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule.

### 1. Defendant's Own Statements

Many statements described herein and sought to be admitted against the defendant are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own admissions, for example, are admissible against him pursuant to Fed. R. Evid. 801(d)(2)(A), without reliance on the coconspirator-statement rule.[4] *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). Additionally, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements against him. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997); *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987).

### 2. Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal

---

[4] Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is … the party's own statement, in either an individual or a representative capacity."

declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. An example would be an order or a suggestion. *See United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868.

Finally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[5] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

### 3.    Statements Against Penal Interest

Under Federal Rule of Evidence 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal

---

[5] Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered out-of-court statement is examined to determine whether it subjected the declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements made to friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g. United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two codefendants which incriminated a third codefendant but was also inculpatory of the first two co-defendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming the district court's decision to admit a co-defendant's inculpatory statement which also incriminated the defendant because it was not made in an attempt to curry favor with law enforcement, but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir.) *cert. denied sub nom. Sarno v. United States*, 135 S. Ct. 382 (2014) and *cert. denied sub nom. Polchan v. United States*, 135 S. Ct. 383 (2014); *United States v. Watson*, 525 F.3d

583, 587-88 (7th Cir. 2008); *United States v. Hamilton*, 19 F.3d 350, 356 (7th Cir. 1994). *See also United States v. Smalls*, 605 F.3d 765, 773-81 (10th Cir. 2010).

### 4. The Supreme Court's Crawford Decision Has Not Changed the Admissibility of Co-Schemer Statements

Only "testimonial" statements implicate the Confrontation Clause, *Crawford v. Washington,* 541 U.S. 36 (2004), and a statement made in furtherance of a conspiracy is, by definition, not a testimonial statement. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (rejecting confrontation clause claim as to introduction of coconspirator statements because such statements are not testimonial); *United States v. Hargrove*, 508 F.3d 445, 448 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

Further, even if a hearsay statement does not qualify for admission under Rule 801(d)(2)(E), or any other hearsay exception, that fact alone would not create a Confrontation Clause issue because, again, only testimonial statements implicate the right to confront a witness. *Crawford,* 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as . . . would an approach that exempted such statements from Confrontation Clause scrutiny altogether."); *see also Volpendesto*, 746 F.3d at 289 ("[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes.").

IV.    **EVIDENCE DEMONSTRATING THE EXISTENCE OF THE CHARGED CONSPIRACY AND DEFENDANT'S PARTICIPATION IN THE CONSPIRACY**

At trial, the government's evidence will establish that beginning no later than in or about April 2014 and continuing until at least in or about June 2014, defendant, defendant's brother (Mario Casarrubias Salgado, hereafter "Mario"), Individual A, and others, conspired with each other and with others to possess with intent to distribute and distribute 1 kilogram or more of heroin in the Chicago area and elsewhere.

As set forth below, the evidence that proves the existence of this conspiracy is very strong. Specifically, the government's evidence at trial will include among other things: (1) the testimony of Individual A, (2) intercepted Blackberry messages between April 2014 and June 2014 involving defendant, Mario, Individual A, and other coconspirators; (3) the testimony of law enforcement officers, including surveillance agents; and (4) heroin seized by law enforcement officers.

Below, the government summarizes some of the evidence that it will present regarding the existence of the charged conspiracy. Such evidence clearly establishes the threshold requirement for admitting coconspirator statements during the trial of this case.

A.    **Testimony of Individual A**

At trial, the government expects that Individual A will testify consistent with the following:[6]

---

[6] Individual A has pled guilty to participating in this drug conspiracy. He has not yet been sentenced, but his Guidelines range is predicted by the parties to be 360 to life. Individual A

From 2012 to 2014 Individual A worked in the Chicago area for a drug trafficking organization called Guerreros Unidos. Guerreros Unidos were based in the state of Guerrero in Mexico. Individual A's role in the drug trafficking operation was to coordinate with associates in Mexico about narcotics shipments headed to Chicago. Individual A would receive passenger buses at warehouses in the Chicago area, unload narcotics that had been hidden in compartments in the buses, coordinate the distribution of narcotics to customers in the Chicago area, and send the narcotics proceeds back to Mexico on the passenger buses.

In 2012, Individual A was living in the Chicago area. Individual A's brother, Individual B, held a leadership position in the Guerreros Unidos. After Individual A lost his job in 2012, Individual A started working for his brother.

Individual A traveled to the city of Toluca in the state of Guerrero in Mexico to meet with his brother so that Individual B could explain the work that Individual A would do for him. During that meeting, Individual B told Individual A that Individual A would help him receive drugs in the Chicago area and deliver those drugs to Individual B's customers. Individual A knew that the drugs were either heroin or cocaine, but Individual A did not know which type at the time.

Individual B told Individual A that he was working with Mario Casarrubias Salgado and that Mario owned passenger buses that transported travelers from Mexico to the Chicago area. The passenger bus line was initially named "Northern

---

is cooperating in the hopes of receiving a recommendation from the government for a reduced sentence of 50% of the low-end of the range.

Star," but the name was later changed to "Monarca" and "Volcano." Individual B and Mario concealed the drugs they transported from Mexico to Chicago in the passenger buses. Individual A understood Mario to be the boss of Guerreros Unidos and that the organization was controlled by members of the Casarrubias Salgado family in Mexico.

A few weeks after his initial meeting with his brother in Mexico, Individual A met Mario in person at his brother's home in Toluca, Guerrero.[7] During that meeting, Mario asked Individual A if Individual A was ready to "work" and Individual A told him that Individual A was. Individual A understood Mario to be asking if Individual A was ready to start receiving and distributing narcotics for him and his brother.

After meeting Mario in Mexico, Individual A returned to Chicago and began receiving the passenger buses with the hidden narcotics. When Individual A first started working for Guerreros Unidos, Individual A rarely spoke to Mario, and mostly spoke with his brother, Individual B. However, Individual A did meet with Mario on a number of occasions when Individual A returned to Mexico.

Before the passenger buses arrived in Chicago, Individual A would receive a BlackBerry message ("BBM") from someone in Mexico who would notify Individual A that a bus would be arriving at a warehouse. At first, the buses were transported to a warehouse in Chicago. Later, Individual A began receiving the buses at warehouses in Aurora and Batavia. Individual A was paid about $3,000 for every bus that

---

[7] Individual A will identify a photo of Mario Casarrubias Salgado.

Individual A received in Chicago. But if a bus did not have narcotics on it, Individual A was not paid anything.

After the buses arrived at the warehouse, Individual A's job was to remove the narcotics and have them delivered to customers in the Chicago area. To do this, Individual A worked with others in Chicago, including Coconspirator A, Coconspirator B, and Coconspirator C. After they delivered the narcotics, they would also collect money from the sale of the narcotics and conceal the money packages on the passenger buses for the return trip to Mexico.

During the time that Individual A was working for his brother and Mario, Individual A made approximately six different trips to Guerrero, Mexico. These trips were social in nature but Individual A did sometimes meet Mario.

In March 2014, Individual B died in a drowning accident. Individual A traveled to Mexico and saw Mario at his brother's wake. Before Individual B died, Individual A usually received direction from Individual B about when narcotics shipments were going to arrive and who to distribute the narcotics to. After Individual B died, Individual A received orders from Mario. Mario's nickname was "M" and most people who worked with him called him "M."

When communicating using BBMs, they would exchange texts with another user who was assigned a PIN, which is an eight-digit combination of letters and numbers. A user can create their own screen name for their PIN. Mario used different screen names in the period of time that Individual A worked with him. One of the screen names that Mario used was "Baltazar."

In late April 2014, Mario was arrested in Mexico. After Mario's arrest, his brothers Adan Casarrubias Salgado and Angel Casarrubias Salgado a/k/a "Chino" took over leadership of the Guerreros Unidos drug cartel,[8] including the drug trafficking operation sending narcotics to Chicago on the passenger buses. Individual A met with Adan and Chino and told them that Individual A did not want to continue working in the drug trafficking business. Individual A told them that Individual A believed the warehouses in the Chicago area were under surveillance by law enforcement. They convinced Individual A to continue working with them in Chicago. They told Individual A that after Individual A received three loads of narcotics, Individual A could stop working for them.

Between June 1, 2014, and June 18, 2014, at Adan's direction, Individual A, Coconspirator A, and Coconspirator C received two bus shipments of heroin (June 1 and June 6), made multiple deliveries of heroin to customers, and received approximately $725,000 in cash drug proceeds.

### B. Intercepted BBM Communications

As part of the investigation, DEA obtained wiretap authorization to intercept the electronic communications (BBMs) of Individual A, among others. The government intends to offer a number of these communications at trial, and Individual A will testify to their context and his understanding of their meaning. These messages corroborate the account provided by Individual A and serve as

---

[8] Individual A will identify defendant (Adan Casarrubias Salgado) in court and will identify a picture of Angel Casarrubias Salgado.

further evidence of the existence of the conspiracy in this case. Some of these messages are set forth below in order to assist in establishing the existence of the conspiracy and defendant's participation in it.

    1.  On April 26, 2014, Individual A Directed Coconspirator A to Pick Up $323,000 in Narcotic Proceeds from FNU LNU, a/k/a "Alan."

On April 26, 2014, at approximately 3:22 p.m. (PID 4233673),[9] Individual A had a BBM conversation with BBM PIN 334B22ED used by Coconspirator A.[10] During that conversation, Individual A asked, "Did you go pick up [narcotics proceeds] with *Paisa* yet?"[11]  Coconspirator A replied, "No."  Individual A stated, "Okay. Go pick up M's [Mario's narcotics proceeds] so they [the money] can be turned in."  Coconspirator A replied, "Okay.  Can you give me the number for M's?"  Individual A responded, "Okay."

On April 26, 2014, at approximately 3:59 p.m. (PID 4233944), Individual A had a BBM conversation with Blackberry PIN 2A75C94C, used by Mario. In that conversation, Mario stated, "7 0 8 5 0 1 2 1 4 9.  He [Coconspirator A] should ask for Alan; this one [narcotics proceeds] is ready."  Individual A replied, "Okay."

---

[9] The intercepted communications are identified in DEA's system and also in discovery by the "production ID" or "PID" or "Session" number, and that number is used herein. The referenced intercepts will be offered as exhibits at trial—with government exhibit numbers. These exhibits are currently in the process of being finalized.

[10] Individual A will identify Courier A as the user of this device.

[11] The BBM communications in this case were originally in Spanish. Draft English translations are used in this proffer. Quotations occasionally have interpretations in brackets, which is based on Individual A's anticipated explanation as well as the government's intended argument.

On April 26, 2014, at approximately 4:01 p.m. (PID 4233945), Individual A had a BBM conversation with Coconspirator A. In that conversation, Individual A stated, "7 0 8 5 0 1 2 1 4 9. Ask for Alan. He is ready." Coconspirator A replied, "Okay."

Continuing on April 26, 2014, at approximately 6:06 p.m. (PID 4234570), Individual A had a BBM conversation with Coconspirator A. During that conversation, Coconspirator A stated, "Okay, finished with Alan. It's 323 [$323,000]. I'm heading over to Paisa now." Individual A replied, "Let me know when you guys are at the warehouse."

2. On April 27, 2014, Individual A Directed Coconspirator A to Pick Up $47,700 in Narcotics Proceeds from a Customer.

On April 26, 2014, at approximately 7:10 p.m. (PID 4235937), Individual A had a BBM conversation with "PAISA". In that conversation, Individual A stated, "Cousin, the guy [Coconspirator A] got busy, but he can go pick up [narcotics proceeds] from you tomorrow." "PAISA" replied, "Okay, it's set. I may have the other paper for him by Tuesday."

On April 27, 2014, at approximately 11:19 p.m. (PID 4239760), Individual A had a BBM conversation with Coconspirator A. In that conversation, Individual A stated, "[Coconspirator A], when you're finished go to *Paisa*." Coconspirator A replied, "Okay."

On April 27, 2014, at approximately 2:13 p.m. (PID 4240493), Individual A had a BBM conversation with Coconspirator A. During that conversation, Individual A stated, "8 7 2 2 1 4 5 4 7 7. Ask for superman … give him all of them [a quantity of

narcotics].” Coconspirator A replied, “Okay.” Individual A then asked, “Did you already with *Paisa* ?” Coconspirator A replied, “I'm right here.”

Continuing on April 27, 2014, at approximately 2:23 p.m. (PID 4240500), Individual A had a BBM conversation with Coconspirator A. Coconspirator A stated, “I already picked up from *Paisa* , there are 47700 [$47,700 in narcotics proceeds].” Individual A replied, “Okay. Look, send me the list of whatever you sent me last week [list of narcotics proceeds that Coconspirator A previously picked up and sent to Individual A].” Coconspirator A stated, “Okay. I'll send it [the list of proceeds] to you when I get home.”

      3. On April 28, 2014, Individual A and Mario Communicated Regarding Heroin that the Conspiracy was to Deliver to Various Narcotics Customers.

On April 28, 2014, at approximately 11:36 a.m. (PID 4246469), Individual A had a BBM conversation with Mario, who was using BBM PIN 2A75C94C.[12] In that conversation, Mario asked, “What's going on buddy? Have they [narcotics couriers] made that delivery yet?” Individual A replied, “No, the meeting was scheduled for 1 [1:00]. Call me on the other number.”

Continuing on April 28, 2014, at approximately 11:59 a.m. (PID 4246572), Individual A had a BBM conversation with Mario. During that conversation, Mario stated, “For the 2 [two kilograms of heroin] orange, 630-215-5581.” Individual A asked, “Who should they ask for?”

---

[12] Individual A will identify Mario as the user of 4246469.

On April 28, 2014, at approximately 12:00 p.m. (PID 4246574), Individual A, had BBM conversation with Coconspirator A. During this conversation, Coconspirator A asked, "Are they [the heroin] all for superman [a narcotics customer]?"

Continuing on April 28, 2014, at approximately 12:01 p.m. (PID 4246694), Individual A, had another BBM conversation with Coconspirator A. During this conversation, Individual A stated, "Yes, except the two [2 kilograms of heroin] that have orange tape. Those are for someone else." Coconspirator A replied, "Yes, but there are more orange ones." Individual A stated, "How many? Put [Coconspirator C] on."

On April 28, 2014, at approximately 12:03 p.m. (PID 4246697), Individual A had a BBM conversation with Mario. In that conversation, Individual A stated, "Buddy, apparently there are more of the orange ones [heroin wrapped with orange tape]." Mario responded, "There are only 2 [two kilograms of heroin wrapped with orange tape]." Mario further stated, "If there are more orange ones, check for 2 [two kilograms of heroin] that have an iguana that sticks out, it stands out as a bulge on the square." Individual A asked, "Okay, there are 7 [seven kilograms of heroin]? Let me check." Mario replied, "It's 2 [two kilograms of heroin] that have a bulge, like an iguana. There are only 2 [two kilograms of heroin] like that." Mario further stated, "And they should ask for *Tio*."

4. On April 28, 2014, at Individual A's direction, Coconspirator A and Coconspirator C Sorted Through the Heroin Received from Mario and Delivered 26 Kilograms of Heroin to Narcotics Customers.

As described above, after Individual A discussed with Mario which narcotics were marked for the narcotics courier "Tio" and for another customer called "superman," Individual A instructed his courier Coconspirator C to determine which kilograms had the iguana stamp because these kilograms needed to be delivered to the narcotics courier "Tio." On April 28, 2014, at approximately 12:05 p.m. (PID 4246698), Individual A, had BBM conversation with Coconspirator C, who was using BBM PIN 334DF84F.[13] During this conversation, Individual A asked, "Hey, how many of the orange ones are there?" Coconspirator C replied, "There are seven [seven kilograms of heroin wrapped with orange tape]." Individual A stated, "The ones with orange tape, are there two different ones? Send me a picture." Coconspirator C responded, "There are seven with orange tape." Individual A asked, "Are there two different ones? Send me a picture of the seven. If there are seven of them, then look for two [2 kilograms of heroin] that have an iguana stamp that sticks out. The iguana sticks out."

Continuing on April 28, 2014, at approximately 12:11 p.m. (PID 4246702), Individual A received a BBM message from Coconspirator C. That message was a photograph of seven kilograms of heroin further wrapped in green cellophane wrapping. Each object had an orange area on top of the object.

---

[13] Individual A will identify the user of this device as Coconspirator C.

23

Continuing on April 28, 2014, at approximately 12:14 p.m. (PID 4246773), Individual A, had BBM conversation with Coconspirator C. In that conversation, Individual A stated, "Yeah, 2 [two kilograms of heroin] are different, their stamp sticks out. I can't see the photo." Coconspirator C replied, "Hold on, I'm checking." Individual A asked, "What happened?" Coconspirator C responded, "Look, there are 8 [eight kilograms of heroin] with green sticker, 12 orange-colored ones, 1 that says *Nacho*, and 5 that don't have a name. The iguana is indistinguishable on the orange ones. I'm going to have to open them. Or tell me what should I do?" Individual A replied, "Only the orange ones. Check them. M [Mario] says that the iguana sticks out. Hey, check the rest to see which ones have the iguana that sticks out."

On April 28, 2014, at approximately 12:24 p.m. (PID 4246774), Individual A, had BBM conversation with Coconspirator A. In that conversation, Individual A stated, "The 2 orange ones are for 6 3 0 2 1 5 5 5 8 1. Ask for *Tio*." Coconspirator A replied, "Okay."

On April 28, 2014 at approximately 1:23 p.m. (PID 4247148), Individual A had a BBM conversation with Coconspirator C. In that conversation, Coconspirator C stated, "There is only 1 [one kilogram of heroin that has the iguana stamp]."

Continuing on April 28, 2014 at approximately 1:24 p.m. (PID 4247275), Individual A, had another BBM conversation with Coconspirator C. Individual A stated, "There should be 2 [two kilograms of heroin with the iguana stamp]. Coconspirator C replied, "There is only 1." Individual A stated, "Check, so the hour doesn't pass. The other one [one kilogram of heroin with the iguana stamp] is

24

probably less noticeable." Coconspirator C replied, "I already checked. You are going to get mad, but I opened all of them. And the guy [narcotics customer] is already waiting." Individual A stated, "It doesn't matter, just put tape on them so you can deliver the rest." Coconspirator C stated, "Only 1 [one kilogram of heroin] has it [the iguana stamp]. I'm here with [Coconspirator A] [Coconspirator A]. I already checked all of them." Individual A responded, "Check it's 2 [two kilograms of heroin have the iguana stamp]." Individual A later asked, "Is the other guy [narcotics customer] there yet, the one who is picking up at 1 [1:00]?" Coconspirator C replied, "Yes, the guy is waiting for us. We already have his truck here with us." Individual A stated, "Okay, go ahead. Perhaps it doesn't look much like the other one. Okay, put [Coconspirator A] [Coconspirator A] in charge of it [the narcotics delivery]. Coconspirator C responded, "Man, I opened all of them [heroin] to see them." Coconspirator C later asked, "Should I get another of the orange ones [heroin wrapped with orange tape]?" Individual A replied, "Yes, one that looks similar." Coconspirator C asked, "But, weren't we looking for the iguana, but there is only 1 [one kilogram of heroin with the iguana stamp]." Coconspirator C further stated, "Okay, but I have the guy [narcotics customer] from 1 [1:00] waiting." Individual A then stated, "Give him [the narcotics customer] that one [one kilogram of heroin with the iguana stamp] and another one [another kilogram of heroin] and deliver the rest. Let me know once you have delivered." Coconspirator C replied, "Okay."

On April 28, 2014, at approximately 1:34 p.m. (PID 4247277), Individual A had a BBM conversation with Mario. In that conversation, Individual A stated, "Buddy,

of the orange ones [kilograms of heroin with orange tape], only 1 [one kilogram of heroin] has the iguana, and the other guy [the narcotics customer] is waiting. They [Coconspirator A and Coconspirator C] already checked the orange ones and only 1 has the stamp." Mario replied, "Give him [the narcotics customer] that one [one kilogram of heroin with the iguana stamp] and another one [another kilogram of heroin]." Mario further stated, "And deliver the rest [of the remaining heroin]."

On April 28, 2014 at approximately 1:58 p.m. (PID 4247337), Individual A had a BBM conversation with Coconspirator C. Individual A stated, "Let me know once you have delivered." Coconspirator C replied, "Yeah, we still haven't." Individual A stated, "Okay, alright." Coconspirator C later stated, "The trip is completed. It's done [Coconspirator C and Coconspirator A delivered the heroin]."

On April 28, 2014 at approximately 2:04 p.m. (PID 4247338), Individual A had a BBM conversation with Coconspirator A. Coconspirator A stated, "Okay, finished with the 24 [delivered 24 kilograms of heroin]." Individual A replied, "Okay, good."

> 5. On June 1, 2014, Individual A Received 26 Kilograms of Heroin at Warehouse 2.

On May 30, 2014, at approximately 7:24 p.m. (PID 4433041), Individual A had a BBM conversation with Coconspirator C. In that conversation, Individual A stated, "Take out the things [heroin], the stickers [heroin]. Put them [heroin] in the trunk of the white one [a white vehicle]." Coconspirator C replied, "We put everything [all the heroin] in the red one [a red vehicle] and we loaded the Acura with stuff [heroin]. It's outside already [the vehicles with the heroin are outside of a warehouse]." Individual A responded, "Okay, all right. Look, not in the red one. It's better if you put everything

[all the heroin] in the trunk of the white one. It's outside [Individual A stating that the white vehicle is outside of Warehouse 1]. Put everything in the white one and we'll move it early [tomorrow]." Coconspirator C stated, "We're not there anymore [not at Warehouse 1]. We're going to put them in Cowboy's car. I'll take care of that right now."

On May 30, 2014, at approximately 9:16 p.m. (PID 4436801), Individual A had a BBM conversation with FNU LNU, a/k/a "FRANKLIN," who was using BBM PIN 7A6E50D1.[14] In that conversation, FRANKLIN stated, "Your aunt [the passenger bus] gets here from 8 and 9 in the morning with the kids [heroin]. The other lady [the other passenger bus] arrives at 7 [7:00 a.m.] to 8 [8:00 a.m.]." Individual A replied, "Okay, alright. Is Adan [defendant] going to give me the # [telephone number of individual picking up the heroin]?" FRANKLIN replied, "Yeah."

On May 30, 2014, at approximately 9:35 p.m. (PID 4436802), Individual A had a BBM conversation with defendant, who was using the Blackberry screenname "STAR" and the PIN 2824C71E.[15] Individual A asked, "Buddy, can you get the number [telephone number of the individual picking up the heroin] so we can deliver?"

On May 30, 2014, at approximately 9:35 p.m. (PID 4436845), Individual A had a BBM conversation with Coconspirator C. In that conversation, Individual A stated, "The aunt [bus] arrives between 7 [7:00 a.m.] and 8 [8:00 a.m.] at the 1 [Warehouse

---

[14] "FRANKLIN" is the Blackberry screen name for the user of BBM PIN 7A6E50D1.

[15] Individual A will identify this device and screenname as used by defendant.

1]. The aunt [another bus] at the 2 [Warehouse 2] is bringing her nephews [heroin]." Coconspirator C asked, "What do you know about the 2 [bus arriving at Warehouse 2]? Did they check it or something like that?" Individual A replied, "No, it's doing good."

Continuing on May 30, 2014, at approximately 9:37 p.m. (PID 4436895), Individual A had a BBM conversation with Coconspirator C. Coconspirator C asked, "What time is the 2 one [bus at Warehouse 2] arriving?" Individual A replied, "Between 8 [8:00 a.m.] and 9 [9:00 a.m.]. You open up the one [open up Warehouse 1] and they [BETANCOURT and Coconspirator A] should go to the 2 [Warehouse 2]." Coconspirator C replied, "Do you want me to unload and load at the same time or what do you want me to do. Or should 2 [bus at Warehouse 2] leave without the documentation [narcotics proceeds]." Individual A responded, "We'll see about that early tomorrow, if the one [bus] that brings the check [narcotics proceeds] arrives." Individual A later instructed, "Go to 1 [Warehouse 1] and open up." Individual A further stated, "If it's possible, we'll take it down [unload the heroin from the bus at Warehouse 1] and we'll put them [the heroin] in the other one [Warehouse 2]."

Continuing on May 30, 2014, at approximately 9:37 p.m. (PID 4436896), Individual A had a BBM conversation with Coconspirator B, who was using BBM PIN 334DDF1A. In that conversation, Individual A stated, "Make arrangements with [Coconspirator A] tomorrow at 7 [7:00 a.m.], okay?

Continuing on June 1, 2014, at approximately 11:20 a.m. (PID 4437820), Individual A had a BBM conversation with Coconspirator C. In that conversation,

Coconspirator C stated, "I'm on my way to two [Warehouse 2] already." Individual A replied, "Okay, cool." Coconspirator C asked, "Hey, the one [the bus] at two [Warehouse 2] is bringing nephews [heroin]. Is that what you told me."

Continuing on June 1, 2014, at approximately 12:00 p.m. (PID 4437850), Individual A had a BBM conversation with Coconspirator C. In that conversation, Individual A stated, "Yes, it [the bus at Warehouse 2] does have [have heroin]. Unload them [the heroin]." Coconspirator C replied, "Okay."

Continuing on June 1, 2014, at approximately 12:43 p.m. (PID 4437900), Individual A had a BBM conversation with Coconspirator C. In that conversation, Coconspirator C stated, "Look at how they sent it, open like that and white [packages containing heroin were open]. Say something to them." Individual A responded, "That's how it came out, fuck, let me check."

Continuing on June 1, 2014, at approximately 12:43 p.m. (PID 4437905), Individual A received a BBM message from Coconspirator C. The message was a photograph of a kilogram of heroin wrapped in black plastic with half of the wrapping peeled off. Underneath the peeled off portion of the plastic was a hard-packed, white-colored substance in a clear vacuum-sealed bag.

On June 1, 2014, at approximately 12:55 p.m. (PID 4437944), Individual A had a BBM conversation with defendant a/k/a "STAR," who was using BBM PIN 2824C71E. Individual A stated, "Buddy, tell whoever arranges them [the individuals who packed the heroin] to pay attention to the work because some came out almost

29

nude [some of the heroin came out of the packages]." Defendant replied, "Alright, I'll tell them."

Continuing on June 1, 2014, at approximately 3:49 p.m. (PID 4438300), Individual A had another BBM conversation with Coconspirator C. In that conversation, Individual A asked, "Where are you going?" Coconspirator C replied, "To eat and then to the house. There were 26 [twenty-six kilograms of heroin that was unloaded from the bus at Warehouse 2]. Individual A asked, "Did you bring [Coconspirator A]?" Coconspirator C replied, "I came to drop [Coconspirator A] off." Individual A stated, "Okay."

> 6. On June 3, 2014, Individual A Directed Coconspirator A and Coconspirator C To Pick Up $600,000 in Narcotics Proceeds from a Courier.

On June 2, 2014, at approximately 5:10 p.m. (PID 4441885), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. In that conversation, defendant stated, "Buddy, I'm going to give you a number so you can pick up some money." Individual A replied, "Okay." defendant stated, "It's going to be 600 [$600,000 of narcotics proceeds]. Do you want the whole thing or half? They can give it in two parts." Individual A responded, "In two parts [two deliveries of $300,000 each] will be fine." In another intercepted BBM communication with Individual A (PID 4441909), at approximately 5:16 p.m., defendant stated, "Okay, here is the number 3 1 2 9 3 1 7 7 2 9, ask for the saint." Individual A replied, "Okay."

On June 3, 2014, at approximately 10:40 a.m. (PID 4444077), Individual A had a BBM conversation with Coconspirator A, who was using BBM PIN 333E56DF. In

that conversation, Individual A stated, "3 1 2 9 3 1 7 7 2 9 for the saint [individual who was to deliver the narcotics proceeds]."

On June 4, 2014, at approximately 12:21 p.m. (PID 4448220), Individual A had a BBM conversation with Coconspirator A. In that conversation, Individual A asked, "How is it going?" Coconspirator A replied, "Fine. They are on their way back now." Individual A asked, "How much did they give you?" Coconspirator A replied, "300 [$300,000]." Individual A stated, "Let me know when you arrive." Coconspirator A responded, "Okay."

On June 4, 2014, at approximately 12:21 p.m. (PID 4448221), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. During that conversation, Individual A asked, "Around what time will you be ready so I can send my brother [Coconspirator A] over there? My guys are already coming. They [Coconspirator A and Coconspirator B] already picked up 300 [$300,000]." Defendant later replied, "Okay, they are going to give 300 [$300,000] more. Individual A asked, "Okay, should they [Coconspirator A and Coconspirator B] go right away?" Defendant responded, "Yes."

On June 4, 2014, at approximately 12:25 p.m. (PID 4448222), Individual A had a BBM conversation with Coconspirator C. In that conversation, Individual A stated, "Look, those guys are coming now. Go so the tickets [narcotics proceeds] can be counted."

Continuing on June 4, 2014, at approximately 1:30 p.m. (Session 4448534), Individual A had a BBM conversation with Coconspirator B. In that conversation, Coconspirator B stated, "Ready. We'll be at the warehouse in 20 minutes."

On June 4, 2014, at approximately 5:32 p.m. (PID 4449383), Individual A had a BBM conversation with Coconspirator B, who was using BBM PIN 334DDF1A. In that conversation, Coconspirator B asked, "Aye, where should we take these tickets [narcotics proceeds] to the warehouse or somewhere else?" Individual A responded, "To the warehouse so they [narcotics proceeds] can be made ready tomorrow."

On June 4, 2014, at approximately 8:38 p.m. (PID 4450574), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. In that conversation, Individual A stated, "We already picked up the 600 [$600,000 of narcotics proceeds]. We'll get them ready tomorrow, cousin, and intend to deliver so that they [the 26 kilograms of heroin that arrived on a bus at Warehouse 1 on June 1, 2014] don't accumulate on us." STAR responded, "Okay, thank you."

       7. On June 5, 2014 and June 6, 2014, the Coconspirators Communicated Regarding the Delivery of 26 Kilograms of Heroin that was Received on June 1, 2014 at Warehouse 2.

On June 5, 2014, at approximately 9:33 a.m. (PID 4451407), Individual A had a BBM conversation with Coconspirator C. In that conversation, Coconspirator C asked, "Hey are we going to deliver the work [heroin]? The one [bus carrying the heroin] for tomorrow is coming and it will be put it away." Individual A replied, "Let me see, I'm checking, I'm going there now."

On June 5, 2014, at approximately 10:14 a.m. (PID 4451512), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN

2824C71E. During that conversation, Individual A asked, "Cousin, can you call the guys so we can deliver the flower vases [twenty-six kilograms of heroin received on June 1, 2014] so they [the heroin] won't accumulate on us?"

Continuing on June 5, 2014, at approximately 11:57 a.m. (PID 4451782), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. During this conversation, defendant asked, "How many flower vases [heroin]." Individual A responded, "There are 26 [twenty-six kilograms of heroin from June 1, 2014]."

On June 5, 2014, at approximately 5:39 p.m. (PID 4453077), Individual A had a BBM conversation with FNU LNU, a/k/a "FRANKLIN," who was using BBM PIN 7A6E50D1. In that conversation, FRANKLIN stated, "The lady [the passenger bus] is arriving tomorrow from 9:00 to 10:00 in the morning."

Continuing on June 5, 2014, at approximately 5:40 p.m. (PID 4453141), Individual A had another BBM conversation with FNU LNU, a/k/a "FRANKLIN," who was using BBM PIN 7A6E50D1. Individual A stated, "Okay. Is she [the passenger bus] bringing the kids [heroin]?" FRANKLIN replied, "Yes." Individual A asked, "Okay, and what time does the other [other bus] arrive?" FRANKLIN responded, "From 7:00 to 8:00 in the morning." Individual A stated, "Okay, alright."

On June 5, 2014, at approximately 8:40 p.m. (PID 4454283), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. Individual A stated, "Cousin, the aunt [the passenger bus containing heroin] will arrive tomorrow. Give me the number [telephone number of individual

who is to receive the heroin] so we can make the delivery so they [the heroin] won't accumulate on us."

> 8. Between June 6, 2014 and June 7, 2014, Individual A Directed Coconspirator A and Coconspirator C to Deliver the Heroin Received on June 1, 2014 and June 6, 2014 to Various Narcotics Customers.

On June 6, 2014, at approximately 11:21 a.m. (PID 4455588), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. In that conversation, defendant stated, "Here goes the number, it is 8 7 2 2 2 3 2 2 8 6. Ask for Diego. Give them the 20 flower vases [20 kilograms of heroin that the Individual A DTO received on June 1, 2014]." Individual A asked, "The ones from today [heroin that arrived at Warehouse 2 on June 6, 2014]?"

Continuing on June 6, 2014, at approximately 11:41 a.m. (PID 4455627), Individual A had another BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. In that conversation, defendant stated, "Oh, give them [Diego] 20 [twenty kilograms of heroin received by Individual A on June 1, 2014] and 6 to another number [the remaining six kilograms of heroin received that day to another individual]." Individual A replied, "Okay." defendant stated, "You want me to give it [the telephone number] to you while I'm at it?" Individual A replied, "Should I deliver the 20 [twenty kilograms of heroin to Diego] first? Yes." Defendant responded, "Yes." Individual A asked, "But, call the other one." Defendant replied, "Okay, for the guy for the 6 [six kilograms of heroin], it's 6 3 0 9 1 5 0 3 2 2. Ask for *botas* [the individual who was to receive the heroin]." Individual A responded, "Okay, sounds good."

On June 6, 2014, at approximately 11:48 a.m. (PID 4455628), Individual A had a BBM conversation with Coconspirator A. In that conversation, Individual A stated, "8 7 2 2 2 3 2 2 8 6. Ask for Diego, give him 20 [twenty out of the twenty-six kilograms of heroin that Individual A received on June 1, 2014]."

On June 6, 2014, at approximately 4:23 p.m. (PID 4456569), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. Defendant stated, "Give 20 [twenty kilograms of heroin] to the first number, to Diego, of what you have stored away [of the heroin that Individual A received on June 1, 2014] and give 6 [six kilograms of heroin] to the other, to *botas*, of the stored ones [from the remaining heroin that Individual A received on June 1, 2014]." Individual A replied, "We haven't unloaded todays [the heroin that arrived on the bus at Warehouse 2 on June 6, 2014]. The other guy called me on behalf of *primo* [the individual who was to receive the heroin that Individual A received on June 1, 2014]. The guy [*primo*] we were going to give the ones I have stored away to [the heroin received on June 1, 2014]?" Defendant responded, "The other one [the heroin that Individual A received on June 6, 2014] tomorrow [needs to be delivered tomorrow]." Individual A stated, "The 26 [twenty-six kilograms of heroin] from last week [received by Individual A on June 1, 2014]. They [the individuals who were to receive that heroin] are saying they can come now. The one that arrived today [heroin received on June 6, 2014] I am going to unload in the morning. Oh, okay, that's fine. So then, the one [heroin] we are going to unload I'll store these away." Defendant replied, "I will give you another # [telephone number of the individual who is to

35

receive the heroin that Individual A received on June 6, 2014] and you can arrange it with him." Individual A stated, "Okay." Defendant responded, "2 1 7 8 4 8 4 3 6 5 on behalf of *primo* for the 20 [twenty kilograms that arrived at Warehouse 2 on June 6, 2014]."

> 9. On June 7, 2014, at Individual A's Direction, Coconspirator A and Coconspirator B Delivered Eleven of the Twenty Kilograms of Heroin that Individual A Received on June 6, 2014 to "*Primo*" and Six Kilograms of Heroin that Individual A Received on June 1, 2014 to "*Botas*."

On June 7, 2014, at approximately 1:12 p.m. (PID 4459705), Individual A had a BBM conversation with Coconspirator B, who was using BBM PIN 334DDF1A. Coconspirator B asked, "Aye, are the 20 [twenty kilograms of heroin] for this *primo*? Individual A replied, "Yes." Individual A further stated, "In the red truck to the number [telephone number] that I gave [Coconspirator A]." Coconspirator B replied, "Okay, I'll let him know." Individual A asked, "Aren't you with him [Coconspirator A]?" Coconspirator B responded, "Yes."

On June 7, 2014, at approximately 1:22 p.m. (PID 4459786), Individual A had a BBM conversation with Coconspirator A. Coconspirator A stated, "Okay. They [the twenty kilograms of heroin] don't all fit in the trap." Individual A responded, "Just the ones that fit [deliver the heroin that fits in the hidden compartment]." Coconspirator A replied, "Okay." Individual A asked, "How many fit?" Coconspirator A replied, "11 [eleven kilograms of heroin]." Individual A stated, "Okay."

Continuing on June 7, 2014, at approximately 1:45 p.m. (PID 4459883), Individual A had a BBM conversation with Coconspirator A. In that conversation, Coconspirator A stated, "Okay, finished with the second [delivery of heroin to *primo*]."

36

Individual A asked, "Only 11 [eleven kilograms of heroin]?" Coconspirator A replied "Yes." Individual A asked, "Okay, when will he [*primo*] be back?" Coconspirator A stated, "Where? We are eating." Individual A stated, "No, the guy you gave 11 [eleven kilograms of heroin] to, when will he [*primo*] come back for the rest?" Coconspirator A responded, "I don't know. Let me check with Diego [Coconspirator B]." Individual A stated, "Okay, I am on my way there so the tires [tires to the bus] can be put on." Coconspirator A replied, "Okay." Individual A then stated, "6 3 0 9 1 5 0 3 2 2. Ask for *votas*, see if he can come. There are 6 [six kilograms of heroin] for him."

Continuing on June 7, 2014, at approximately 2:04 p.m. (PID 4459937), Individual A had a BBM conversation with Coconspirator A. Coconspirator A stated, "They [*primo*] said tomorrow at 11:00." Individual A replied, "Okay. Good. I'll wait for you here at the warehouse."

On June 7, 2014, at approximately 4:23 p.m. (PID 4460497), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. Individual A stated, "[Coconspirator B] could only fit 11 [eleven kilograms of heroin], he'll [*primo*] come tomorrow for the rest and for *votas* has to be handed over early [the additional six kilograms of heroin will be delivered to the individual called "botas"]."

On June 8, 2014, at approximately 10:49 a.m. (PID 4463642), Coconspirator A, had a BBM conversation with Individual A. Coconspirator A stated, "The guy is coming for the 6 [six kilograms of heroin] that I told the guy. What are you waiting for?" Individual A asked, "Where is the truck at?" Coconspirator A replied, "In the

warehouse." Individual A stated, "Ok give it to them [the individual picking up the six kilograms of heroin]."

On June 8, 2014, at approximately 6:53 p.m. (PID 4464696), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. Individual A stated, "Hey man, I delivered to *Votas* and he has not answered to return the truck, check if everything is ok."

Continuing on June 9, 2014, at approximately 11:31 a.m. (PID 4465872), Individual A had a BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. Defendant stated, "*Botas* finally responded, they called him and he said everything is fine."

10. Between June 16, 2014, and June 18, 2014, at Individual A's Direction, Coconspirator A Picked Up Narcotics Proceeds from Couriers of Narcotics Customers, "*La Torre*" and "*Veterano*."

On June 16, 2014, at approximately 1:07 p.m. (PID 4482422), Individual A had the following BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. Defendant stated, "Cousin, I am going to give you a # [telephone number] so you can pick up 125 [$125,000 in narcotics proceeds] and add them to what you got." Individual A replied, "But, would it be for the one [the bus] arriving Friday. Today's [the bus] is leaving already, we already filled [filled the bus with narcotics proceeds]. Send it [the telephone number] to me." Defendant stated, "For Friday. I am going to send you another 200 more [an additional $200,000 in narcotics proceeds] of 100 and 100 [two separate pick-ups of $100,000 each]." Defendant later stated, "It's 7 7 3 6 4 1 1 2 3 7, to *la torre*. It's 125 [$125,000 in narcotics proceeds] with him."

38

On June 16, 2014, at approximately 4:19 p.m. (PID 4482796), Individual A had a BBM conversation with Coconspirator A. Individual A stated, "7 7 3 6 4 1 1 2 3 7. *La torre*."

On June 16, 2014, at approximately 4:58 p.m. (PID 4482897), Individual A had the following BBM conversation with defendant, a/k/a "STAR," who was using BBM PIN 2824C71E. Defendant stated, "Buddy, this is the other one, 7 7 3 4 9 4 7 3 0 1 with *Veterano*, he is going to give 100 [$100,000 in narcotics proceeds]."

Continuing on June 17, 2014, at approximately 7:23 p.m. (PID 4484626), Individual A had a BBM conversation with Coconspirator A. Coconspirator A asked, "Can you guys give me the guy's number so that I can go pick up tomorrow?" Individual A replied, "7 7 3 4 9 4 7 3 0 1 for *el Veterano*. He's going to give you 100 [$100,000 in narcotics proceeds]." Coconspirator A stated, "Okay."

Continuing on June 18, 2014, at approximately 2:31 p.m. (PID 4484807), Individual A had a BBM conversation with Coconspirator A. During that conversation, Individual A stated, "Did they only give you 100 [$100,000]?" Coconspirator A replied, "105 [$105,000]." Individual A stated, "Okay, then and how about yesterday?" Coconspirator A replied, "125 [$125,000]."

Continuing on June 18, 2014, at approximately 2:57 p.m. (PID 4484810), Individual A had a BBM conversation with defendant, who was using BBM PIN 2824C71E. Individual A stated, "We already picked up, they gave 105 [$105,000], and yesterday 125 [$125,000]."

## C.     Heroin Seizures

On June 7, 2014, after surveilling Coconspirator A and Coconspirator B work in tandem to provide a Volkswagen SUV to another individual, agents conducted a traffic stop on the Volkswagen SUV and seized approximately 20 kilograms of heroin from a hidden compartment within the vehicle.

On June 10, 2014, after observing Coconspirator A appear to deliver a Chrysler Pacifica to a store parking lot, which vehicle was then driven away by another individual, agents stopped the individual and performed a consent search on the van during which they seized approximately 26 kilograms of heroin located in a hidden trap compartment within the van.

## V.     COCONSPIRATOR STATEMENTS

Based on the foregoing proffer of evidence demonstrating the existence of a conspiracy and defendant's participation in the conspiracy, the government intends to offer certain coconspirator statements at trial pursuant to FRE 801(d)(2)(E), all of which come from intercepted BBM communications over the devices used by Individual A.

Set forth below is a representative set of some of these statements, in order to demonstrate how the communications were in furtherance of the conspiracy.[16] Following the summaries below, the government sets forth the PIDs for the remaining statements the government intends to offer (as of this time). These

---

[16] The particular statements being offered for the truth of the matter asserted, and offered under FRE 801(d)(2)(E), are underlined.

additional statements involve the same coconspirators and are "in furtherance" in the same manner as the examples set forth in full below.[17]

| PID | Statement | "In Furtherance" Explanation |
|---|---|---|
| 4227485 | Coconspirator A:   <u>Ok finish</u><br>Coconspirator A:   <u>The man already left</u><br>Individual A:   Did you deliver today<br>Coconspirator A:   <u>Yes</u><br>Individual A:   How many<br>Coconspirator A:   <u>All of them</u><br>Individual A:   How many were there<br>Coconspirator A:   <u>24</u> | Individual A confirming delivery of the conspiracy's drugs by Coconspirator A |
| 4227486 | Individual A:   Cousin <u>we already delivered it did end up happening today</u><br>Mario:   Ok all done | Individual A informing Mario that conspiracy's drugs were delivered |
| 4236385 | Coconspirator A:   <u>Ok so then there are 296</u><br>Coconspirator A:   <u>For the aunt</u> | Coconspirator A telling Individual A how much conspiracy cash drug proceeds ($296,000) is available to place in the bus ("the aunt") to be transported to Mexico |
| 4236395 | Individual A:   <u>Cousin we already picked up 323 today I am going to grab for the week for expenses</u> | Individual A informing Mario that conspiracy cash drug proceeds ($323,000) had been received and that a business expense was going to be deducted |
| 4236595 | "PARTNER":   <u>He/It's arriving tomorrow at 10 am</u><br>Individual A:   Ok all set all done let me know when the one from iguala arrives | FNU LNU a/k/a "PARTNER" informing Individual A that the next bus is arriving the next day |

<hr>

[17] To the extent the defense has any particularized objections to any of the statements referenced only by PID, the government can provide additional particularized discussion of the statement(s).

| | | |
|---|---|---|
| 4240493 | Individual A:     Did you already pick up from the *el paisa* [countryman]<br>Coconspirator A:    <u>I'm here</u> | Coconspirator A confirming he is in process of picking up conspiracy's cash drug proceeds |
| 4247337 | Coconspirator C:    <u>Round completed. It got done already</u><br>Individual A:     Ok all set all done | Coconspirator C confirmed delivery of the conspiracy's drugs |
| 4247338 | Coconspirator A:    Ok finish<br>Coconspirator A:    With the 24 | Coconspirator A informed Individual A that the delivery of 24 kilograms of drugs was complete |
| 4247438 | Individual A:     <u>Cousin we already delivered we only have to do two</u> | Individual A confirming delivery with Mario |
| 4253856 | "Viejito JR":    <u>Old man we have ploblems with m</u><br>Individual A:     Whathappened<br>Individual A:     Yes<br>"Viejito JR":    <u>They caught him</u> | "Viejito JR" informing Individual A that Mario had been arrested |
| 4436801 | Franklin:    <u>Your aunt arriving between 8 and 9 in the morning with the children the other lady arrives from 7 to 8</u><br>Franklin:    All set everything is good here we go<br>Individual A:     Ok all set<br>Individual A:     <u>Adan is going to give me the #</u> | "Franklin" updating Individual A on the arrival of the drug-laden buses, and Individual A confirming that defendant ("Adan") would give the phone number of the person to whom the drugs would be delivered |
| 4437900 | Coconspirator C:    <u>Look at the way they sent it like this open. And white. Tell them. Something.</u> | Coconspirator C reporting to Individual A that the coconspirators in Mexico sent the drugs in an unwrapped state |
| 4438300 | Coconspirator C:    And afterwords to the house. <u>It was 26</u><br>Individual A:     Did you bring [Coconspirator A]<br>Coconspirator C:    I came to drop off. [Coconspirator A]<br>Individual A:     Ok<br>Coconspirator C:    <u>Yes</u> | Coconspirator C confirming with Individual A that 26 kilograms of drugs were unloaded from the bus that arrived, and that Coconspirator A helped unload |

| | | |
|---|---|---|
| 4443876 | Torton: Listen that is where we got caught pipi and ami and me and also nena with pipi tell them what do they want for us to get caught<br>Individual A: It's not going to be there <u>adan will tell you where</u> | Individual A telling "Torton" where to go to receive cash drug proceeds, and stating that defendant (Adan) will tell Torton where specifically to go |
| 4443902 | Individual A: <u>2824c71e</u><br>Individual A: <u>of adan</u><br>Torton: Ok | Individual A providing "Torton" The Blackberry Messenger PIN of defendant (Adan) so Torton can communicate with defendant about where to go to pick up the cash drug proceeds |
| 4448220 | Individual A: How are they doing<br>Coconspirator A: Good they're almost on their way back<br>Individual A: How much did they give you<br>Coconspirator A: <u>300</u> | Coconspirator A confirming that they received $300,000 in cash drug proceeds |
| 4450574 | Individual A: <u>We picked up the 600 already</u><br>Individual A: We'll get them ready tomorrow<br>Individual A: Cousin and to deliver it so that they don't pile up on us | Individual A confirming with defendant that they picked up the conspiracy's $600,000 in cash drug proceeds |
| 4451782 | Defendant: How many vases are there<br>Individual A: <u>The ones that are here are 26</u> | Individual A informing that the conspiracy currently has 26 kilograms of heroin on hand in Chicago |
| 4456569 | Individual A: <u>We haven't brought down today's the other one called me on behalf of primo [the cousin]</u><br>Individual A: <u>The one that we were going to give him those that I have put away</u><br>Defendant: The other one not till tomorrow<br>Individual A: <u>The 26 from last week</u><br>Individual A: They say they can come already<br>Individual A: <u>The one that arrived today I am going to bring it down tomorrow</u> | Individual A informing defendant that he was contacted by primo's Coconspirator And that Individual A would give him heroin from the shipment the week prior, because the most recent load had not been unloaded from the bus |

| 4459786 | Coconspirator A: <u>They don't all fit in the catera</u><br>Individual A:    The ones that fit<br>Individual A:    They should come tomorrow<br>Coconspirator A:    Ok<br>Individual A:    How many fit<br>Coconspirator A:    <u>11</u> | Coconspirator A informing Individual A that not all of the kilograms fit in the hidden trap compartment, and that only 11 kilograms fit |
| 4466119 and 4466215 | Defendant:   How many vases do you have total<br>Individual A:    9 of/from the one of 11 and 26 arrived today | Individual A informing defendant that the conspiracy currently has on hand in Chicago 9 kilograms of heroin from the batch of 11 and the 26 that were just delivered by bus. |
| 4482422 | Defendant:   Cousin I'm going to give you a # so that you all pick up 125 and you throw it in together with what you have<br>Individual A:    <u>But it would be for the one that is arriving on Friday today is leaving already we already put in</u> | Individual A informing defendant that the $125,000 cash drug proceeds defendant is asking to be picked up, will have to be put inside the bus arriving Friday because the current bus is leaving and already filled with drug proceeds. |

Additional statements:

> 4235937
> 4239760
> 4240500
> 4247148
> 4421556
> 4423196
> 4433009
> 4436845
> 4436895
> 4437820
> 4437850
> 4442073
> 4443840
> 4448222

4448534
4449383
4451407
4453077
4453141
4454283
4459548
4459705
4459883
4459937
4460446
4460497
4462612
4463641
4463642
4464696
4467479
4468768
4468769
4468780
4468808
4471042
4474167
4474232
4475768
4481823
4481832
4481863
4484626
4484807
4484810

## VI.     CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed and that defendant was a member of the conspiracy. The Court should find, based upon this proffer, that coconspirator statements are admissible pending the introduction of evidence to support this proffer.

45

Dated:      August 7, 2023

                                          Respectfully submitted,
                                          MORRIS PASQUAL
                                          Acting United States Attorney

By: /s/ *Andrew C. Erskine*
                                          ANDREW C. ERSKINE
                                          MICHELLE PARTHUM
                                          Assistant United States Attorney
                                          219 South Dearborn Street
                                          Chicago, Illinois 60604
                                          (312) 353-5300